783 F.2d 906
 57 A.F.T.R.2d 86-901, 86-1 USTC P 9250
 Leo G. EBBEN and Donna W. Ebben, Gilbert Dreyfuss and Evelyn
H. Dreyfuss; Donald Kaufman and Gloria Kaufman;
Eli Broad and Edythe L. Broad,
Petitioners- Appellants,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.
 No. 84-7474.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Oct. 11, 1985.
Decided Feb. 25, 1986.
 
 Gilbert Dreyfuss, Douglas W. Argue, Richard, Watson, Dreyfuss & Gershan, Los Angeles, Cal., petitioners-appellants.
 Bruce Ellisen, Michael Paup, Dept. of Justice, Washington, D.C., for respondent-appellee.
 Petition to Review a Decision of the Tax Court of the United States.
 Before REINHARDT, BEEZER and HALL, Circuit Judges.
 CYNTHIA HOLCOMB HALL, Circuit Judge:
 
 
 1
 Taxpayers Leo G. Ebben, Donna W. Ebben, Gilbert Dreyfuss, Evelyn H. Dreyfuss, Donald Kaufman, Gloria Kaufman, Eli Broad, and Edythe L. Broad petition for review of a tax court decision redetermining deficiencies in their federal income taxes. The Internal Revenue Service (IRS) asserted the deficiencies after taxpayers, a partnership, claimed charitable deductions from the donation of property to Pitzer College. We affirm in part and reverse in part the tax court's redetermination of taxpayers' liability.
 
 
 2
 * In December 1968 taxpayers Kaufman and Broad purchased an unimproved parcel of real estate for $548,000. They paid $3,416 in cash and gave a nonrecourse note for $544,584, secured by a deed of trust. In addition, Kaufman and Broad prepaid $999,211.20 of interest on the note.
 
 
 3
 On January 1, 1969 taxpayers and others formed Whitney Farms, a general partnership created to hold real estate investments. A few days later, Kaufman and Broad transferred their interests in the subject property to Whitney Farms as a contribution of capital. The partnership took the property subject to the note and trust deed. Whitney Farms continued to hold the property until December 28, 1973 when the entire parcel was donated to Pitzer College, a qualified charitable organization under the Internal Revenue Code of 1954, 26 U.S.C. Sec. 170 (cited hereafter as "I.R.C."). Pitzer accepted the gift subject to the note and deed of trust, which secured an outstanding obligation in the amount of $544,584 on the date of transfer.
 
 
 4
 The donated property consisted of 931.66 acres located in Placer County. Fiddyment Road divides the parcel into two areas: 322.63 acres west of the road (west tract) and 609.03 acres east of the road (east tract). As of December 28, 1973, both tracts were zoned "U," except for an irregular 75-acre "arm" of the east tract which was zoned "M" or "M-D." A "U" zone permits agricultural or residential uses, while an "M" or "M-D" zone allows for more valuable industrial uses.
 
 
 5
 Taxpayers hired three expert appraisers to value the land at the date of transfer to Pitzer for purposes of calculating their charitable deductions. From interviews with county officials and a planning report commissioned by the county, these appraisers concluded that the entire east tract had industrial potential and valued the land accordingly. Taxpayers used these appraisals to calculate their charitable deductions as follows:
 
 
 6
 Appraised value at date of gift $1,420,000
 
 
 7
 Less: Deed of trust $ 544,584
 
 
 
 Total deduction $ 875,416
 The taxpayers claimed a deduction on their individual tax returns proportionate to their partnership interest in Whitney Farms.
 The IRS disagreed with taxpayers' valuation, and asserted deficiencies in the various years in which the deductions were claimed. Specifically, the IRS asserted: (1) that the east tract had been overvalued by almost $1 million, and (2) that taxpayers' relief from the nonrecourse loan should be treated as a bargain sale to a charity resulting in taxable gain under I.R.C. Sec. 1011(b). Taxpayers then filed a petition in the tax court to redetermine the deficiencies; the tax court upheld the IRS's assessment.
 II
 We review the tax court's determination of property value under the clearly erroneous standard. Hokanson v. Commissioner, 730 F.2d 1245, 1249 (9th Cir.1984); United States v. McConney, 728 F.2d 1195, 1200 n. 5 (9th Cir.1984) (en banc), cert. denied, --- U.S. ----, 105 S.Ct. 101, 83 L.Ed.2d 46 (1985). Complex factual inquiries such as valuation require the trial judge to evaluate a number of facts: whether an expert appraiser's experience and testimony entitle his opinion to more or less weight; whether an alleged comparable sale fairly approximates the subject property's market value; and the overall cogency of each expert's analysis. Trial courts have particularly broad discretion with respect to questions of valuation.[1] The tax court's decision to analyze the gift of encumbered property as a bargain sale is reviewed de novo. McConney, 728 F.2d at 1201.
 III
 The IRS asserts that taxpayers overvalued the east tract in two ways. First, the portion of the east tract zoned "U" should be valued as farm land rather than a potential industrial site because agriculture was the highest and best use for the land on the transfer date. Second, taxpayers failed to prove that the portion of the east tract zoned "M" or "M-D" was worth more than the government's appraisal of $1,000 per acre. The tax court ruled for the IRS on both of these issues. We affirm the tax court's valuation of the portion of the east tract zoned "U" and reverse the tax court's decision with respect to the portion zoned "M" or "M-D".
 * Treasury Regulation Sec. 1.170A-1(c)(2) defines the fair market value of property as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts."[2] Both parties cite this regulation approvingly, but they disagree as to the "relevant facts." The amount a "willing buyer" would pay for the subject property depends, of course, on the uses to which he may put the land. As of the transfer date, all but 75 acres of the east tract was zoned for agricultural or residential use. The tax court found agriculture to be the highest and best use for the land and assigned a value of $600 per acre.[3]
 Taxpayers contend that the tax court's valuation is clearly erroneous because it conflicts with their evidence that the east tract will be rezoned for industrial uses. The appraisers hired by taxpayers considered the entire east tract to have industrial potential and valued it at $1,500 to $2,000 per acre.[4] The tax court, however, relied on the alternative analysis put forth by the government's appraiser. The tax court found that the portion of the east tract zoned "U" had no industrial potential in the foreseeable future because: (1) a surplus of undeveloped industrial land existed in 1973 (only 10% of the designated industrial district had been developed); (2) testimony that county officials would have approved rezoning in 1977 was inadequate to show there would have been support for rezoning in 1973; and (3) the government's appraiser relied in part on two sales of land adjoining the industrial district, both of which had sold in the $600 range.[5] On the basis of these facts, we hold that the tax court's decision to value the east tract as agricultural land is not clearly erroneous. We therefore affirm the tax court's value of $600 per acre for the portion of the east tract zoned for unclassified uses.
 B
 The parties also disagree as to the value of the 75 acres in the east tract zoned for industrial use. In five of the six consolidated cases the tax court ruled that this portion of the east tract was worth $1000 per acre. In the Ebben case, however, the tax court assigned a value of $1600 per acre to the same land. The tax court clearly erred in assigning a lower value to the same land in five of the six cases. We reverse the tax court in those five cases and hold that the 75 acres in the east tract zoned "M" or "M-D" should be valued at $1600 for each taxpayer.
 By tax court rule, the value used by the IRS in its statutory notice of deficiency is presumed correct. T.Ct. Rule 142(a) (codified at 26 U.S.C. foll. Sec. 7453). The notices of deficiency mailed to the taxpayers in this case contained different values for the subject property.[6] The tax court, however, chose not to rely on the presumed correctness of the notices of deficiency and instead assigned its own value to the 75 acres. Having decided to make an independent valuation, the tax court should have assigned just one value for the subject property.[7]
 Our review of the record indicates that the evidence supports a value of $1600 per acre for the land zoned "M" or "M-D" in all of the six cases before us. We therefore reverse the tax court's decision to value the industrial portion of the east tract at $1000 per acre in five of the six cases.
 IV
 The second issue before us is how basis is to be computed upon the gift of the subject land to a charitable organization. We hold that a transfer by gift of encumbered property to a charity is a "sale" under section 1011(b).
 Section 1001 states that "the gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided in section 1011...." I.R.C. Sec. 1001(a). Under section 1001, the phrase "other disposition of property" includes a gift of property. Treasury Regulation Sec. 1.1001-2(a)(4)(iii) provides: "A disposition of property includes a gift of the property or a transfer of the property in satisfaction of liabilities to which it is subject."
 Taxpayers concede that the amount of the encumbrance on the property contributed to charity is an "amount realized." See Estate of Levine v. Commissioner, 72 T.C. 780, 789-91 (1979) aff'd, 634 F.2d 12, 15 (2d Cir.1980). Taxpayers also concede that the contribution to charity is a disposition of property which causes the amount of the encumbrance to be an "amount realized" by the taxpayers on such disposition. Thus, taxpayers realized $544,584 from the transfer of the property to Pitzer because the college took the land subject to a note and deed of trust in that amount. But taxpayers contend that "not every disposition of encumbered property to a charity is a 'sale' to the extent of the encumbrance, but will be considered a 'sale' only where the taxpayer directly or indirectly realized a benefit from such encumbrance." Taxpayers then limit "benefit" to receipt of cash when a loan is placed on the property prior to the contribution or deduction of depreciation with respect to the amount of the encumbrance which had been included in taxpayers' basis under Crane v. Commissioner, 331 U.S. 1, 67 S.Ct. 1047, 91 L.Ed. 1301 (1947). We hold that every contribution of mortgaged property to charity is a "sale" and basis is computed under section 1011(b).[8]
 Taxpayers assert that in this case their basis is calculated under paragraph (a) of section 1011 which states that adjusted basis is historical cost minus some adjustments which are not relevant in this case. Under section 1011(a), the taxpayers' adjusted basis is the purchase price of the property, $548,000 ($3,416 cash plus a $544,584 mortgage). There was no adjustment for depreciation because the subject property was unimproved. Taxpayers therefore contend that the donation of the property to Pitzer did not give rise to taxable gain because the amount realized ($544,584) was less than the adjusted basis of the property ($548,000).
 The IRS, on the other hand, contends that paragraph (b) of section 1011 controls the basis calculation. Section 1011(b) provides:If a deduction is allowable under section 170 (relating to charitable contributions) by reason of a sale, then the adjusted basis for determining the gain from such sale shall be that portion of the adjusted basis which bears the same ratio to the adjusted basis as the amount realized bears to the fair market value of the property. (Emphasis added.)
 Under this paragraph, taxpayers realize taxable gain because the amount realized ($544,584) exceeds the allocated basis ($506,679).[9]
 As stated above, the issue before us is whether the gift of mortgaged property to a charity is a "sale" under section 1011(b). Taxpayers assert that because section 1011(b) uses the word "sale" rather than the term "sale or other disposition" used elsewhere in the Code, Congress intended to limit the scope of section 1011(b) to cases in which the taxpayer received a benefit such as cash on mortgaging the property or depreciation deduction with respect to the property prior to transferring it to the charity.
 The Supreme Court in Commissioner v. Tufts, 461 U.S. 300, 307-310, 103 S.Ct. 1826, 1831-1832, 75 L.Ed.2d 863 (1983), however, established that taxation on relief from debt under Crane does not depend on any theory of economic benefit and applies to situations in which no depreciation deductions have been taken. The Court stated:
 This, however, does not erase the fact that the mortgagor received the loan proceeds tax-free and included them in his basis on the understanding that he had an obligation to repay the full amount.... When the obligation is canceled, the mortgagor is relieved of his responsibility to repay the sum he originally received and thus realizes value to that extent within the meaning of Sec. 1001(b). From the mortgagor's point of view, when his obligation is assumed by a third party who purchases the encumbered property, it is as if the mortgagor first had been paid with cash borrowed by the third party from the mortgagee on a nonrecourse basis, and then had used the cash to satisfy his obligation to the mortgagee.
 Tufts, 461 U.S. at 312, 103 S.Ct. at 1834 (citation omitted). When the taxpayers in this case gave the subject property to Pitzer College, which took the property subject to the debt, it was as if the taxpayers had been paid with cash borrowed by Pitzer College from the mortgagee on a nonrecourse basis, and then had used the cash to satisfy their obligation to the mortgagee. "When a taxpayer receives a loan, he incurs an obligation to repay that loan at some future date. Because of this obligation, the loan proceeds do not qualify as income to the taxpayer. When he fulfills the obligation, the repayment of the loan likewise has no effect on this tax liability." Tufts, 461 U.S. at 307, 103 S.Ct. at 1831. But when someone else relieves him of his obligation to pay the loan, it is as though the taxpayer had received cash and the transfer of the encumbered property to the charity is the equivalent of a sale without regard to any tax benefit theory. See Commissioner v. Peterman, 118 F.2d 973 (9th Cir.1941) (transfer held to be "sale or exchange" within meaning of capital gains provisions even though transferor received no economic benefit); Freeland v. Commissioner, 74 T.C. 970, 977 (1980) (same).
 The tax court, in a decision unanimously reviewed by the full court, has specifically held that a gift of encumbered property to a charity is a "sale" as that term is used in section 1011(b). Guest v. Commissioner, 77 T.C. 9 (1981). The taxpayer in Guest donated mortgaged property to a charity. The court held that the gift resulted in taxable gain and the basis used to determine gain was an allocated basis calculated under section 1011(b). Guest, 77 T.C. at 24-26 & n. 12.
 The tax court concluded that there was a sale under section 1011(b): "we are convinced that [taxpayer's] charitable contribution of the properties must ... be treated as a sale or exchange." Guest, 77 T.C. at 25. In reaching this conclusion, the tax court relied on Freeland v. Commissioner. "We believe the holdings of Crane and subsequent cases decided in the light of Crane mandate the conclusion that relief from indebtedness, even though there is no personal liability, is sufficient to support a sale or exchange." 74 T.C. 970, 981 (1980) (emphasis in original). The Guest court then concluded that section 1011(b) applies "to both sales and exchanges, despite the sole use of the word sale in the statute." 77 T.C. at 25 (citing Treas.Reg. Secs. 1.1011-2(a)(1) & 1.1011-2(a)(3) ).
 The IRS has consistently interpreted "sale" in section 1011(b) to include gifts of mortgaged property to a charity. Treasury Regulation Sec. 1.1011-2(a)(3) states:
 If property is transferred subject to an indebtedness, the amount of indebtedness must be treated as an amount realized for purposes of determining whether there is a sale or exchange to which section 1011(b) and this section apply, even though the transferee does not agree to assume or pay the indebtedness.
 Taxpayers contend that this regulation should be read to cover only "disguised sales," rather than all gifts of mortgaged property. A disguised sale occurs when the taxpayer mortgages the property just prior to giving it to a charity. In such a case, the donor receives the cash proceeds of the loan and the charity receives the property subject to the debt. However, the Commissioner in Rev.Rul. 81-163, 1981-1 C.B. 433, made it clear he did not intend to limit the regulation to disguised sales. In Rev.Rul. 81-163 a taxpayer transferred property with a basis of 15x and a fair market value of 25x to a charity. The property was subject to a mortgage of 10x, and the charity accepted the property subject to the debt. These facts are identical to the case before us: the property's fair market value exceeds the basis, and the basis exceeds the amount of indebtedness. Rev.Rul. 81-163 concludes that the taxpayer must allocate the basis of the property under section 1011(b).[10]
 Taxpayers maintain that the IRS's interpretation of section 1011(b) in Treas.Reg. Sec. 1.1011-2(a)(3) exceeds the scope of the statute. Our review of the Commissioner's regulations is strictly limited. We may set aside Treas.Reg. Sec. 1011-2(a)(3) only if it is not a reasonable interpretation of section 1011(b). "The choice among reasonable interpretations is for the Commissioner, not the courts." National Muffler Dealers Association v. United States, 440 U.S. 472, 488, 99 S.Ct. 1304, 1312, 59 L.Ed.2d 519 (1979). Treasury regulations are valid if they "implement the congressional mandate in some reasonable manner." United States v. Correll, 389 U.S. 299, 307, 88 S.Ct. 445, 450, 19 L.Ed.2d 537 (1967). "In determining whether a particular regulation carries out the congressional mandate in a proper manner, we look to see whether the regulation harmonizes with the plain language of the statute, its origin, and its purpose." National Muffler, 440 U.S. at 477, 99 S.Ct. at 1307.
 The plain language of section 1011(b) applies to sales to a charitable organization. Neither the code nor the regulations, however, define the word sale directly.[11] This distinguishes the case before us from the Supreme Court cases cited by the taxpayers which have invalidated Treasury regulations because they were inconsistent with terms already defined by Congress. See, e.g., United States v. Vogel Fertilizer Co., 455 U.S. 16, 25-26, 102 S.Ct. 821, 827-28, 70 L.Ed.2d 792 (1982) (regulation inconsistent with "brother-sister controlled group" because term defined specifically by the code); Rowan Companies, Inc. v. United States, 452 U.S. 247, 254-58, 101 S.Ct. 2288, 2293-95, 68 L.Ed.2d 814 (1981) (regulation which defined "wages" to include value of meals and lodging in oil rig employees' salaries invalid because code definition of wages excluded these items).
 In the absence of specific direction from Congress, we find that the Commissioner's regulation interpreting section 1011(b) is reasonable.[12] The congressional mandate embodied in section 1011(b) is to offset the "combined effect ... of not taxing the appreciation and at the same time allowing a charitable contributions deduction for the appreciation." H.R.Rep. No. 413, 91st Cong. 1st Sess. 53, reprinted in 1969-3 C.B. 200, 234, U.S.Code Cong. & Admin.News 1969, p. 1699. Treasury Regulation Sec. 1.1011-2(a)(3) thus harmonizes with the origin and purpose of section 1011(b).[13]
 On balance, the cases, Treasury regulations, and revenue rulings support the tax court's conclusion that taxpayers realized gain. Accordingly, we hold that a charitable contribution which entails relief from nonrecourse indebtedness is a "sale" within the meaning of section 1011(b).
 AFFIRMED in part and REVERSED in part.
 BEEZER, Circuit Judge, concurring in part and dissenting in part.
 I concur in parts I, II, and III of the majority opinion as regards the statement of facts, standard of review, and the proper valuation of the land donated by the taxpayers to Pitzer College, a charitable organization under section 170. Because I do not agree that this gift of encumbered land constitutes a bargain sale under section 1011(b), requiring the allocation of the basis between the portion "sold" and the portion contributed to the charity, I respectfully dissent from part IV of the opinion.
 On the date of the transfer to Pitzer College, taxpayers' property had an adjusted basis of $548,000 and secured an outstanding obligation of $544,584.[1] The land was donated to Pitzer College subject to the note and deed of trust, which was without recourse against the taxpayers. Whether a gift of encumbered property to a charitable organization gives rise to a taxable gain under section 1011, even when the adjusted basis of the property exceeds the amount of the debt and when the taxpayers have received no economic benefit through relief from the encumbrance, is a matter of first impression in the courts of appeals. Statutory interpretation of the Internal Revenue Code involves a question of law reviewed de novo. Dumdeang v. Commissioner, 739 F.2d 452, 453 (9th Cir.1984).
 Taxpayers concede that the disposition of the encumbered land through the contribution to Pitzer College resulted in an "amount realized" to the extent of the indebtedness under 26 U.S.C. Sec. 1001. See Estate of Levine v. Commissioner, 634 F.2d 12 (2d Cir.1980) (in computing gain or loss from the "sale or other disposition" of property as the difference between the amount realized and the adjusted basis of the property, the amount of the encumbrance debt on gifted property constitutes amount realized), aff'ming 72 T.C. 780 (1979). The dispute in this case centers on the application of the basis provisions of section 1011. 26 U.S.C. Sec. 1011.
 Taxpayers contend that because the total adjusted basis exceeds the amount of the indebtedness (amount realized), taxpayers have not realized a taxable gain from the disposition of the encumbered land. See Sec. 1011(a).
 The Tax Court held, and the Internal Revenue Service argues before us, that a partial basis approach should be applied according to the allocation formula set forth in section 1011(b):
 If a deduction is allowable under section 170 (relating to charitable contributions) by reason of a sale, then the adjusted basis for determining the gain from such sale shall be that portion of the adjusted basis which bears the same ratio to the adjusted basis as the amount realized bears to the fair market value of the property.
 This "bargain sale" provision of Sec. 1011(b) was adopted by Congress in 1969 to address, in part, the problem raised by the combined effect of not taxing the appreciation in value of property, and at the same time allowing a charitable contributions deduction for the entire amount of the appreciation. H.Rep. No. 413, 91st Cong., 1st Sess. (1969), reprinted in, 1969 U.S.Code Cong. & Ad.News 1645, 1699; 2 B. Bittker, Federal Taxation of Income, Estates and Gifts Sec. 35.2.4, at 35-21 (1981). Prior to 1969, if a taxpayer sold appreciated property to a charitable organization at a price equal to the cost basis, the entire appreciation could be taken as a deduction and no tax was assessed on the gain. 1969 U.S.Code Cong. & Ad.News at 1699; Jackson, The New Rules Governing Bargain Sales to Charitable Organizations Under the Tax Reform Act of 1969, 24 Tax Lawyer 279, 279 (1971).
 The "bargain sale" provision treats a charitable contribution as part sale, part gift, allocating the basis between the two separate elements of the transaction. The application of this statutory provision is particularly important in a situation where the amount realized by a bargain sale to a charitable organization is less than the adjusted basis. Ordinarily this would result in no gain at all; but with the allocation of the basis under the section 1011(b) formula, some gain will be realized if the property has appreciated. In the instant case, the Service applied section 1011(b) to the taxpayers' transaction as follows:[2]
 By contending that section 1011(b) applies to the taxpayers' transaction in this case, the Service is arguing that all gifts of property subject to encumbrance must be considered a "sale" under that section to the charitable organization for the amount of the indebtedness. Rev.Rul. 81-163, 1981-1 C.B. 433. The Tax Court has adopted this approach. Guest v. Commissioner, 77 T.C. 9, 24-26 (1981). I cannot conclude that Congress intended every transfer of encumbered property to a charity to be deemed a "sale," regardless of whether there is any indicia of a "sale," such as a direct economic benefit received by the transferor.
 If Congress had intended section 1011(b) to have so broad an application, Congress would not have adopted the narrow term "sale" in its drafting of this statutory provision. By contrast, in several other sections of the Internal Revenue Code, when Congress intended a provision to govern other types of transfers, the language "sale or other disposition" has been enacted. See, e.g., Secs. 1001(a), 1001(b), 1011(a). The Internal Revenue Code is a complex and intricate statutory compilation governing complex financial transactions. We must assume that Congress carefully selected and intentionally adopted the language enacted into federal tax law. By selecting the term "sale" in section 1011(b), Congress cannot be deemed to have intended something different. It is not the province of this court or the Tax Court below to conclude that Congress mistakenly enacted narrow language or absent-mindedly forgot to include language of broader application.[3]
 Adopting a narrower interpretation of section 1011(b) than that suggested by the Service would not preclude practical applications of the provision to govern those transactions which are in substance a "sale," although in form an exchange or other disposition. It does not do violence to the plain language of the statute to hold that a taxpayer may not avoid the basis allocation provision of section 1011(b) through a disguised sale, such as by receiving the proceeds of a money loan secured by appreciated property and then transferring the property to a charity subject to the debt. See Jackson, supra, 24 Tax Lawyer at 281. In such a case, the taxpayer has received a direct economic benefit by reason of the transaction. This type of disposition is properly regarded as a bargain sale to the charitable organization.
 The question remains in the instant case whether any sale or exchange has occurred. See Jackson, supra, 24 Tax Lawyer at 280. The taxpayers in the instant case have not received any economic benefit as a result of the transfer of the land subject to the encumbrance.[4] They did not receive the proceeds from the loan, as it arose as a purchase money encumbrance. They are not relieved of any personal liability by the transfer of the land to the college, as it was a nonrecourse loan.[5] Nor could they deduct any depreciation with respect to the amount of the encumbrance as the property was unimproved.[6]
 It is true that the taxpayers have realized a benefit of sorts by reason of the nonrecourse encumbrance, in that it facilitated speculation in land at little risk. With a minimal cash downpayment, the nonrecourse loan allowed the taxpayers to hold the property with little danger of loss or liability. Had the land depreciated in value, the taxpayers could have allowed it to be foreclosed at little actual loss to themselves. When the property instead appreciated in value, the taxpayers had the choice of selling the property and recognizing the gain or contributing the property to a charitable organization and claiming a deduction under section 170.
 This, however, was a benefit realized by reason of the existence of the nonrecourse encumbrance as a financing method, not by reason of relief from the encumbrance through a transfer of the land subject to it. The intangible benefits of low-risk nonrecourse financing to investors in land is not the type of economic benefit that is so analogous to a "sale," as to make section 1011(b) applicable.
 The Service relies on Crane v. Commissioner, 331 U.S. 1, 67 S.Ct. 1047, 91 L.Ed. 1301 (1947), as authority for the proposition that an economic benefit is obtained by the discharge of a nonrecourse mortgage. In Crane, the Supreme Court held that a taxpayer, who sold property subject to a nonrecourse encumbrance, must include the value of the indebtedness in the computation both of the adjusted basis and of the amount realized upon the sale.
 The primary ground for the Court's decision was the impracticality of considering the taxpayer's equity as the "property" interest for the determination of the basis, particularly in computing depreciation, because the equity constantly changes with amortization of the mortgage. Id. at 9-10, 67 S.Ct. at 1052; see also Commissioner v. Tufts, 461 U.S. 300, 305, 307, 103 S.Ct. 1826, 1830-1831, 75 L.Ed.2d 863 (1983); 2 B. Bittker, Federal Taxation of Income, Estates and Gifts Sec. 35.2.4, at 43-19 (1981). (In fact, the taxpayer in Crane had claimed some $25,000 depreciation based on a basis of $250,000, which included the amount of the nonrecourse debt when the taxpayer inherited the property. 331 U.S. at 4.) As Bittker puts it, "The Court's interpretation of IRC Sec. 1001(b) [on amount realized] was, in essence, a by-product of the taxpayer's $250,000 date-of-death basis for the property and her concomitant right to compute depreciation on that basis." B. Bittker, supra, Sec. 43.5.2, at 43-19. See also Estate of Levine v. Commissioner, 634 F.2d 12, 15 (2d Cir.1980).
 However, the Supreme Court went beyond this ground of administrative simplicity justifying inclusion of nonrecourse indebtedness in the amount realized, to also reason that a transfer subject to a nonrecourse mortgage results in a benefit to the transferor that is "as real and substantial" as if a personal debt were assumed by another. 331 U.S. at 14. The Service argues that this holding is authority for its conclusion that the taxpayers in the instant case have received an economic benefit such that the transaction should be considered a "sale" subject to section 1011(b).
 The economic benefit rationale of Crane has been the subject of severe criticism as both unpersuasive and unnecessary to the result. E.g., B. Bittker, supra, Sec. 43.5.2, at 43-21; Adams, Exploring the Outer Boundaries of the Crane Doctrine: An Imaginary Supreme Court Opinion, 21 Tax L.Rev. 159, 169-70, 175-76 (1966); see Estate of Levine, 634 F.2d at 15 & n. 6. As Bittker explains:
 The Court was right, of course, in asserting that owners of mortgaged property must keep up the payments if they want to retain the property and that for this period of time they must treat mortgages as personal obligations whether they are personally liable or not; but it does not follow that the "benefit" to such taxpayers from transferring the property subject to the mortgage is the same in both cases....
 ....
 ... Relief from a nonrecourse debt is not an economic benefit if it can be obtained only by giving up the mortgaged property. It is analogous to the relief one obtains from local real property taxes by disposing of the property: Like nonrecourse debt, the taxes must be paid to retain the property; but no one would suggest that the disposition of unprofitable property produces an economic benefit equal to the present value of the taxes that will not be paid in the future.
 B. Bittker, supra, Sec. 43.5.2, at 43-20 to 43-21 (emphasis in original).
 The Supreme Court itself has recently backed away from this economic benefit reasoning. In Tufts v. Commissioner, 461 U.S. 300, 103 S.Ct. 1826, 75 L.Ed.2d 863 (1983), the Court extended the result in Crane to a sale where the unpaid amount of the nonrecourse mortgage exceeded the fair market value of the property. In such a case, the landowner clearly does not have any incentive to maintain payments on the mortgage. Thus, under the Crane Court's reasoning, there is no benefit obtained by keeping up payments, such that relief from the nonrecourse debt would be analogous to a discharge of personal liability.[7] However, the Supreme Court held that the result in Crane still applied to this situation, stating:
 Crane ultimately does not rest on its limited theory of economic benefit; instead we read Crane to have approved the Commissioner's decision to treat a nonrecourse mortgage in this context as a true loan. This approval underlies Crane's holdings that the amount of the nonrecourse liability is to be included in calculating both the basis and the amount realized on disposition. That the amount of the loan exceeds the fair market value of the property thus becomes irrelevant.
 Id. at 307, 103 S.Ct. at 1831. See also B. Bittker, supra, Sec. 43.5.2, at 43-19.
 The Court thus grounded its holding in Tufts on the practical implications noted in Crane, particularly that by including the amount of the nonrecourse debt in the calculation of the basis, the taxpayer is permitted to take depreciation deductions on that full amount. See Tufts, 461 U.S. at 309 & n. 7, 103 S.Ct. at 1832 & n. 7. As the basis is computed on the assumption that the taxpayer is obligated by the amount of the indebtedness, it naturally follows that the amount realized must reflect the indebtedness, subject to which the property is transferred. In addition, the Court noted that, because the amount of the nonrecourse debt is included in the basis, permitting the taxpayer to limit his realization to the fair market value of the property (where the debt exceeds that basis amount) would allow the taxpayer to recognize a tax loss on the sale for which he has suffered no corresponding economic loss. Id. at 313, 103 S.Ct. at 1834.
 Even were the Supreme Court to reaffirm the economic benefit reasoning in Crane today in its interpretation of section 1001 governing the calculation of the amount realized, which appears unlikely, I do not believe the Court would extend that artificial rationale to the very different context of section 1011(b) to determine whether a bargain "sale" has occurred. Contra Guest v. Commissioner, 77 T.C. 9, 24 (1981) (quoting Freeland v. Commissioner, 74 T.C. 970, 981 (1980)).
 Finally, the regulation promulgated by the Treasury to govern the application of section 1011(b) to property transferred subject to encumbrance is not necessarily inconsistent with the reasoning in this dissent. The regulation reads:
 If property is transferred subject to an indebtedness, the amount of the indebtedness must be treated as an amount realized for purposes of determining whether there is a sale or exchange to which section 1011(b) and this section apply, even though the transferee does not agree to assume or pay the indebtedness.
 26 C.F.R. Sec. 1.1011-2(a)(3) (emphasis added).
 The regulation indicates that the encumbrance is to be considered as a factor in determining whether a bargain sale has occurred, to which section 1011(b) applies. Although the regulation clearly contemplates that transfers subject to indebtedness may constitute a "sale", the posing of the question "whether" indicates there well may be such situations where a contrary conclusion may be reached. An acceptable interpretation of the regulation, as it is written, is to require the transaction to be examined in order to determine whether there is a disguised sale or exchange for the amount of the indebtedness.
 In conclusion, I would hold that if the amount of nonrecourse indebtedness is less than the taxpayer's basis in the property, the taxpayer does not receive a taxable gain from the transfer of appreciated property to a charitable organization subject to the encumbrance, unless the taxpayer has received an economic benefit as a result of relief from the indebtedness through transfer of the land. For this reason, I respectfully dissent in part.
 1 "A trial judge's decisions on qualitative matters of this type are so rarely overturned on appeal that they are, for practical purposes, conclusive." B. Bittker, Federal Taxation of Income, Estates and Gifts p 132.5.2 & n. 20 (1982).
 2 This standard, however, provides little guidance for reviewing courts. As the tax court noted in an earlier opinion, the problems of valuation are "more properly suited for the give and take of the settlement process than adjudication." Buffalo Tool & Die Mfg. v. Commissioner, 74 T.C. 441, 451-52 (1980).
 3 Taxpayers' experts valued the agricultural land in the west tract at $650 an acre. On appeal, taxpayers have not contested the IRS's valuation of $600 an acre.
 4 Several facts supported their appraisal:
 1. Land zoned "U" or "unclassified" usually acquires the zoning of adjacent property. The "U" classification is an interim zone that affords planners flexibility to meet the changing needs of the community. Because all of the land abutting one side of the east tract was zoned industrial, the odds were good that the east tract would be rezoned for industrial uses in the future.
 2. Roland Sutton, Director for Industrial Development in Placer County from 1973-1976, stated that there was no difference in terms of potential for industrial development between the 75 acres zoned "M" in the east tract and the remaining 534.03 acres. He also stated that the "U" zone did not affect his opinion of the east tract's suitability for industrial development.
 3. In December 1973 the County commissioned an engineering report to study planned industrial expansion in the area. Taxpayers' appraisers knew of this report through county officials and knew the area under study included the east tract. In 1975 the study reported that the east tract was a "logical future [extension] of the present industrial district." The county board of supervisors accepted this finding and other county officials relied on the report for planning purposes.
 4. Robert McHale, who replaced Roland Sutton as Director of Industrial Development in 1977, testified that he would have favored an application to rezone the east tract for industrial uses.
 5. And finally, in 1980 Pitzer College received offers for the land ranging from $2,977 to $3,969 per acre, perhaps indicating that buyers were convinced of the land's industrial potential.
 None of these factors persuade us that the tax court's valuation is clearly erroneous. Most of taxpayers' evidence is either speculative or relates to events after the date of transfer. For example, taxpayers argue that the offers Pitzer College received in the $3,000 to $4,000 per acre range in 1980 prove that the tax court undervalued the land. According to the government's appraisal, the donated property increased in value only 7 1/2% during the years 1968-1973, while climbing 500% or more from 1973-1980. Subsequent market data, however, is insufficient to set aside the tax court's value because the relevant question is whether the court's finding was clearly erroneous based on information available as of December 1973, the date of transfer. I.R.C. Sec. 2512(a). Moreover, even if taxpayers could rely on hindsight, their argument would not justify reversing the tax court because changes in property value over time are not a linear function.
 5 Taxpayers argue that the tax court's value is clearly erroneous because the east and west tract received the same value. The tax court concluded that both tracts were worth $600 per acre, thereby declining to add any premium for the east tract's industrial potential. At trial, much of the testimony concerned the probability of rezoning all of the east tract for industrial uses. Taxpayers asserted that the east tract's industrial potential would be realized in the near future, while the government's appraiser maintained that it might be as long as 75 years before the county needed to rezone the east tract. We uphold the tax court's decision that the portion of the east tract zoned "U" should be valued as agricultural land.
 6 The IRS determined the fair market value of the property to be $547,600 in notices mailed to all of the taxpayers except the Ebbens. In Ebben the notice of deficiency omitted the fair market value of the property, but allowed a deduction for charitable contributions of $11,494.36. A fair market value of $872,994.29 can be derived by dividing the allowable deduction by Ebben's partnership interest and adding the amount of the outstanding note. Thus:
 Deduction allowed $ 11,494.36
Divided by Ebben's interest .035
 -----------
Total deduction $328,410.29
Add: amount of note $544,584.00
 -----------
Fair market value $872,994.29
 7 The tax court attempted to explain the different values in terms of which party had the burden of proof. The taxpayers bore the burden of proving the property was worth more than the amount stated in the notice of deficiency, while the IRS had the burden of proving that the value stated in Ebben's notice was too high. This correctly states the rule, but does not justify the result. Ebben's notice did not include a specific value for the 75 acres zoned for industrial use, just an assessment for the entire parcel donated to the college. If the tax court had adequate proof to specify a value, it should have been the same for all of the taxpayers.
 8 We note that in this case taxpayers certainly received some kind of a benefit in that they purchased the property for only $3,416 cash and took a charitable deduction of $875,416. In addition, Kaufman and Broad, who purchased the property, persumably deducted $999,211.20 prepaid interest on the purchase of the property.
 9 The IRS calculated the gain for all of the taxpayers except for the Ebbens as follows:
 Fair Market Value = $588,996
Adjusted basis = $548,000
Nonrecourse debt = $544,584
(a) Ratio = Debt = $544,584
 ----------------- --------
 Fair Market Value $588,996
 Ratio = .9245971
(b) Allocation of basis to sale
 Adjusted basis x ratio = Allocated basis
 548,000 x .9245971 = $506,679.21
(c) Calculation of gain on sale
 Amount realized (nonrecourse
 debt) $544,584.00
 Less: Allocated basis $506,679.21
 ------------
 Gain $ 37,904.79
 The same calculation in Ebben yields a gain of almost $74,000. The difference can be traced to the role the fair market value plays in the denominator of the allocation ratio. A higher fair market value results in a smaller allocated basis and hence more gain.
 10 The transaction results in 4x of taxable gain:
 (a) Ratio = 10x = .40
 ---
 25x
 (b) Allocation = 15x X .40 = 6x
 (c) Gain = 10x - 6x = 4x
 11 Treasury Regulation Sec. 1.1002-1(d) defines "sale" indirectly: "Ordinarily, to constitute an exchange, the transaction must be a reciprocal transfer of property, as distinguished from a transfer of property for a money consideration only." But this definition adds little to the petitioners argument beyond an appeal to common sense that the word "sale" means for money consideration.
 12 The Tax Reform Act of 1969 significantly limited the tax benefits available from charitable contributions. See, e.g., I.R.C. Sec. 170(e)(1)(A) (restricting a taxpayer's deduction for contributions of property which would have produced ordinary income or short-term capital gain to the taxpayer's basis in such property); Sec. 170(b)(1)(D) (limiting maximum charitable contribution for long-term property to 30% of taxpayer's contribution base); Sec. 170(f)(3) (denying charitable contribution for the "free use" of property by a charity); see also Randall, Charitable Contributions After the 1969 Tax Reform Act, 11 Gonz.L.Rev. 869 (1976). Our approval of the IRS's interpretation of 1011(b) is thus consistent with the general intent of the 1969 Act to limit certain charitable contributions. The Senate initially rejected the bargain sale provision of section 1011 for fear that it would reduce charitable donations. S.Rep. No. 552, 91st Cong., 1st Sess. 82, reprinted in 1969-3 C.B. 423, 476, U.S.Code Cong. & Admin.News 1969, p. 1645. In conference between the House and Senate section 1011(b) was accepted without explanation, thus providing no insight as to the exact meaning of "sale."
 13 The Commissioner introduced Treas.Reg. Sec. 1.1011-2(a)(3) twelve years ago. Our research discloses no substantial criticism of the Regulation during this period. When Treas.Reg. Sec. 1.1011-2(a)(3) was first offered for notice and comment, one commentator concluded that the Regulation was "too broad." Whitaker, Dealing with Outright Gifts to Charity in Kind, 30th Annual N.Y.U. Inst. on Fed. Taxation 45 (1972). The author's argument, however, is mainly directed at cases in which the donor transfers encumbered property and agrees to pay the debt. Id. at 73-75. That is not the case before us. To the extent the article criticizes sale treatment for gratuitous transfers of encumbered property without an agreement to repay the debt, it merely offers an alternative interpretation of Sec. 1011(b) which the Commissioner properly rejected. A rule excluding such transfers from Sec. 1011(b) would lead to odd results. If any cash were involved in the transaction, say $100, the contribution would be a bargain sale and hence an allocated basis would be used. The amount realized would have to include the $100 and the amount of nonrecourse debt. See Crane, 331 U.S. at 1, 67 S.Ct. at 1047. It is difficult to justify why a contribution without the $100 receipt of cash should receive a different basis under Sec. 1011(a). Treas.Reg. Sec. 1.1011-2(a)(3) is therefore a reasonable interpretation of Sec. 1011(b) in light of Crane and its progeny.
 Petitioners' claim that Ebben would be the first case to apply an allocated basis for calculating gain from a gratuitous transfer is misguided. Their assertion apparently stems from an incorrect footnote in Cunningham, Payment of Debt with Property--the Two-Step Analysis after Commissioner v. Tufts, 38 Tax Lawyer 575, 616 n. 255 (1985). The author asserts that only Ebben uses an allocated basis among recent cases that raise this issue. However, the author reaches this conclusion by incorrectly stating that Guest relied on a full basis. We note that the tax court in Guest concluded that "petitioners adjusted bases for calculating his gain ... should be determined under Sec. 1011(b), and his gain is equal to the difference between the outstanding mortgages and that portion of his adjusted bases which bears the same ratio to the adjusted bases as the amount of the mortgages bears to the fair market value of the properties." 77 T.C. at 25-26. Our decision today follows this same allocation formula.
 1 The adjusted basis consists of the note on the deed of trust amounting to $544,484 and a cash down payment of $3,416.
 2 The above represents the Service's calculation of gain for all of the taxpayers except the Ebbens, as a higher fair market value for the land was determined in the Ebbens' case. The same calculation for the Ebbens yields a gain of $73,868.
 Fair Market Value: $588,996
 Adjusted Basis: 548,000
 Amount Realized (Debt): 544,584
(a) Ratio of Amount Realized to Fair Market Value
 -----------------------------------------------
 Debt $544,584
 ---- --------
 Fair Market Value 588,996
 Ratio = .9245971
(b) Allocation of Basis to Sale
 ------------------------------
 Adjusted Basis x Ratio = Allocated Basis
 $548,000 x .9245971 = $506,679
(c) Calculation of Gain on Sale
 ------------------------------
 Amount Realized (Debt) 544,584
 Less: Allocated Basis 506,679
 ---------------
 Gain: $ 37,905
 3 An examination of the legislative history of section 1011(b) is uninstructive in this case. The committee reports provide no elaboration on the meaning of the term "sale." The House Report only includes an example of the provision, describing a standard sale of appreciated property to a charity at cost (basis). H.Rep. No. 413, 91st Cong., 1st Sess. (1969), reprinted in 1969 U.S.Code Cong. & Ad.News 1645, 1701. Although the legislative history may be silent, I conclude the plain language of the statute mandates the result suggested in this dissent.
 4 Although the payment of interest on the nonrecourse debt was deductible, this was an out-of-pocket expense which cannot be considered an economic benefit to taxpayers.
 Nor should the tax benefit of the charitable deduction be considered. This benefit flows from the provision of the Internal Revenue Code, and is not a direct economic benefit stemming from the sale itself.
 5 We need not decide whether relief from a recourse note, if still a purchase money encumbrance, would require a different result. A persuasive argument could be made that such satisfaction of personal liability is that type of economic benefit sufficient to constitute a "sale" under section 1011(b).
 6 We also need not decide whether the taking of depreciation deductions would change the result. It is likely that depreciation deductions would instead be adjusted for under section 170(e), which reduces the amount of the charitable deduction by the amount of gain that would have been treated as ordinary income under the recapture rules of Sec. 617(d) (certain mining property), Sec. 1245 (certain depreciable tangible personal property), and Sec. 1250 (certain depreciable real property) if the property had been sold at its fair market value.
 7 Indeed, the Crane Court noted it would have been an entirely different situation if the value of the property had been less than the amount of the nonrecourse mortgage. The Court acknowledged that, in such a case, the landowner who is not personally liable could not realize a benefit equal to the amount of indebtedness by transferring the property subject to the encumbrance. 331 U.S. at 14 n. 37, 67 S.Ct. at 1054 n. 37.