HAROLD S. TIDLER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Tidler v. Commissioner
Docket No. 32713-84.
United States Tax Court
T.C. Memo 1987-268; 1987 Tax Ct. Memo LEXIS 268; 53 T.C.M. (CCH) 934; T.C.M. (RIA) 87268; June 1, 1987. Robert E. Bullard, for the petitioner. Dahil D. Goss, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: Respondent determined the following deficiencies in petitioner's Federal income taxes: Taxable Year
Deficiency
1974
[1] $31,273.54
1975
26,323.00
1976
49,181.00
1977
61,689.00
1978
44,992.00
1979
34,862.00
After concessions, we must determine (1) the fair market value of a 15.0396-acre tract of land donated by 197 Investment Partnership to Intercity Hospital Corporation; and (2) the amount of the charitable deduction, if any, to which petitioner is entitled. [2] For reasons of convenience, we have combined our findings of fact *270 and opinion. Some of the facts have been stipulated and are so found. This reference incorporates the stipulations of facts and attached exhibits. Petitioner resided in Silver Spring, Maryland at the time he filed his petition in this case. On December 23, 1969, petitioner, a practicing physician, and Dr. Allan Offen ("Dr. Offen") formed the 197 Investment Partnership ("197 Partnership"), a State of Maryland general partnership, to acquire and own as an investment a certain parcel of real estate. From the partnership's *271 inception until October 1, 1972, petitioner and Dr. Offen each owned a 50-percent interest in 197 Partnership. Subsequently and prior to the years at issue herein, each partner sold a 10-percent share of his 50-percent interest in 197 Partnership to LB Partnership for $26,000, or a total of $52,000. During the years 1970 through 1972, 197 Partnership acquired the following properties: a) 122.6062 acres from Edna B. Tidler (petitioner's mother) for $625,000, by deed dated December 31, 1970 and recorded January 14, 1971, with a purchase money mortgage back to Mrs. Tidler for $615,000; b) 1.3536 acres from George W. Henson for $30,000 cash, by deed dated August 12, 1971 (this parcel was purchased for frontage on the Laurel-Bowie Road to provide access to the 122.6062 acre parcel); and c) 5 acres from Edna B. Tidler for $50,000, by deed dated March 15, 1972, with a purchase money mortgage for $26,799.09 back to Mrs. Tidler (this parcel was assembled to provide space to complement the frontage purchased from Mr. Henson). The original contract of sale for the 122.6062 acres between Edna B. Tidler and 197 Partnership was dated February 10, 1970. Both purchases of land made by 197 *272 Partnership from Edna B. Tidler were arm's-length transactions. On June 15, 1970, Dr. Offen organized Intercity Hospital Corporation ("Intercity") as a for-profit corporation for the construction and operation of a general hospital to be known as Parkway Medical Center ("Parkway"). Dr. Offen was the sole shareholder of Intercity during the period it was a for-profit corporation. Petitioner was not involved in the activities of Intercity. On August 18, 1970, Intercity, as "contract purchaser," applied for a special exception for a general service hospital to be built on 21.7 acres of the 122.6062 acres owned by Edna B. Tidler. Edna B. Tidler signed the application for special exception as owner of the land. On November 16, 1970, the Prince George's County Planning Board of the Maryland National Capital Park and Planning Commission unanimously recommended, at a public hearing, the approval of the application for special exception. On November 27, 1970, the Prince George's County Council, sitting as the District Council for the Maryland-Washington Regional District, following a public hearing on November 24, 1970, unanimously approved the grant of special exception for the requested *273 purpose. On October 22, 1970, Intercity applied for a certification of conformance (now known as a certificate of need) to the State of Maryland, acting through an agency then known as the Maryland Comprehensive Health Planning Agency ("MCHPA"), to construct Parkway on 15.0396 of the 21.7 acres which had been granted the special exception. On May 14, 1971, the MCHPA granted Intercity a certificate of need valid for one year to build Parkway. The certificate of need contained 8 conditions. From the inception, there were difficulties in achieving compliance with these conditions. On June 20, 1972, Parkway was recertified for a period of 90 days. On October 11, 1972, the project was again recertified for 90 days. Thereafter until May 8, 1974, there were further recertifications for varying periods of six months or less. During the period from October 11, 1972 to May 8, 1974, Parkway was not able to meet the conditions attached to the certificate of need to warrant a full one year extension. The certificate of need granted by the MCHPA generated both resistance and support for the project by individuals, professional groups and civic groups. On May 8, 1974, Parkway was recertified *274 for a period of one year with stringent conditions by the MCHPA and an admonishment to Parkway that all conditions and stipulations specified in the certificate of need be met. Pursuant to the Comprehensive Health Plan developed and effective under sec. 59C of Article 41 of the Maryland Code, the following projects were certified in Prince George's County by the MCHPA: (a) Southern Maryland Hospital Center, in Clinton, on March 26, 1971; (b) Prince George's Doctors Hospital, in Lanham, on April 2, 1971; (c) Parkway Medical Center (subject project) on May 14, 1971; (d) Greater Laurel Hospital Authority, in Laurel, on October 16, 1972; and (e) Bowie Health Center on March 27, 1974. Prince George's Doctors Hospital, Greater Laurel Hospital Authority and Bowie Health Center, comprising a total of 656 new hospital beds, were approved. All of these approved hospital sites were to be located within 8 miles of the proposed Parkway site. On June 1, 1972, Dr. Offen created a limited partership known as Parkway Hospital Partnership to purchase the hospital site from 197 Partnership, construct the hospital and then lease it to Intercity. A prospectus to sell 100 limited partnership *275 interests was prepared by Baker, Watts & Co. However, as a result of the then rising cost of mortgage money and the difficulty of obtaining it, Dr. Offen and Intercity abandoned their attempts to obtain financing through the limited partnership concept. In order to obtain funding for the construction of Parkway through the Maryland Health and Higher Educational Facilities Authority (hereinafter referred to as the "State Bond Authority"), Intercity, influenced by then Governor Marvin Mandel and Councilwoman Gladys Noon Spellman, announced in November, 1973 its conversion to a non-profit corporation. On January 18, 1974, by Articles of Amendment, Intercity converted to a non-profit corporation. At the organizational meeting of the Board of Trustees of Intercity, as reconstituted, held on January 26, 1974, Intercity agreed to accept from Parkway Hospital Partnership all of Parkway Hospital Partnership's right, title and interest in and to the plans, commitments, contracts, and every other asset of Parkway Hospital Partnership, subject to the obligations and commitments associated with or related to all such items, in any way incident to the planning, financing, development and construction *276 of Parkway in consideration for the reimbursement to Parkway Hospital Partnership or the payment by Intercity to such creditors for expenses incurred by Parkway Hospital Partnership in the planning, financing, development and construction of Parkway. In addition, Intercity agreed to reimburse and pay for expenses of similar nature paid or incurred by Dr. Offen and entities in which Dr. Offen had an interest. Pursuant to this agreement, on June 15, 1974, Intercity executed a note in the amount of $344,666.55 to the order of Dr. Offen and on July 28, 1975, a similar note for $47,558.78. On June 18, 1974, the United States Government took 45.8683 acres of the 122.062 acres of land originally purchased by 197 Partnership from Edna B. Tidler in 1970. The Government initiated condemnation proceedings in the United States District Court for the District of Maryland (Civil Action H 74-628). The parcel condemned was all of the land south of the proposed Outer Beltway (now known as the "Intercounty Connector"). The condemnation case was settled before trial in July, 1976, the Government paying, and 197 Partnership accepting, $10,000 per acre for the land taken, of which $229,300 was applied *277 to reduce the 1970 mortgage to Mrs. Tidler, leaving a balance on the mortgage of $385,700. On July 16, 1974, Intercity borrowed $100,000 from 197 Partnership evidenced by a note without any maturity date, but providing for interest at 10 percent per annum to be paid annually. On July 2, 1974, Intercity and 197 Partnership executed a Hospital Development Agreement with American Medical International ("AMI") to assist Intercity in the development, financing and construction of Parkway. On July 8, 1974, Intercity and AMI executed a Construction Loan Agreement in which AMI agreed to advance $500,000 to Intercity for the maintenance of construction activity on Parkway until permanent financing could be obtained. This advance was to be secured by a second deed of trust (subject to the existing mortgage to Edna B. Tidler). In July, 1974, Intercity and 197 Partnership executed a second deed of trust note in the amount of $500,000 in favor of AMI, to be secured by the second deed of trust. In June, 1974, construction began on the 15.0396 acres hospital site owned by 197 Partnership pursuant to a contract between Intercity and Volpe Construction Co., Inc. ("Volpe Construction"). The *278 $500,000 advanced by AMI was used to pay Volpe Construction. On August 20, 1974, Intercity was advised by the MCHPA that the agency viewed its reported progress in meeting the conditions of permanent financing and public support contained in the May 8, 1974 recertification to be unsatisfactory. In September, 1974, construction of Parkway stopped and has never been resumed. When construction stopped, the only improvement made to the 15.0396 acres was the excavation and construction of concrete caissons and footings to support the planned hospital building. On September 5, 1974, the Internal Revenue Service granted Intercity tax exempt status under section 501(c)(3). [3] On November 7, 1974, 197 Partnership obtained the release of the 15.0396 acres from the original 1970 mortgage to Mrs. Tidler and recorded it on November 8, 1974. On November 7, 1974, 197 Partnership executed a mortgage for $82,717.80 to Edna B. Tidler, that being the amount allocable to the 15.0396 acres from the original 1970 mortgage. The mortgage was recorded on November 8, 1974. *279 By deed of gift, dated November 8, 1974 and recorded on November 13, 1974, 197 Partnership conveyed the 15.0396 acres of land to Intercity. The deed did not provide for the transfer of "entitlements," rights or intangible property as part of the gift of the 15.0396 acres of land, nor did it indicate the existence of any encumbrance. It did, however, provide that the partnership "will warrant specially the property here conveyed." The mortgage for $82,717.80 remained an encumbrance on the 15.0396 acres at the time of the gift and no principal had been paid on this mortgage as of the time of trial herein. On November 12, 1974, Intercity recorded a second deed of trust dated November, 1974, securing AMI in the amount of $500,000 pursuant to the terms of the Hospital Development Agreement dated July 2, 1974 and the Construction Loan Agreement dated July 8, 1974. As of November 8, 1974, the date of the deed of gift, Intercity had not been successful in obtaining a permanent financial commitment to build Parkway pursuant to the required condition of the May 8, 1974 recertification. On June 5, 1975, Intercity was advised by the MCHPA that the certification of need for Parkway would *280 not be renewed. By letter dated July 7, 1975, the MCHPA denied reconsideration. Intercity appealed the decision not to renew its certification to the Secretary of the Department of Health and Mental Hygiene and, on September 11, 1975, the Secretary upheld the denial to renew. Intercity appealed the denial to renew to the Board of Review of the Maryland State Department of Health and Mental Hygiene and the denial was reversed. No new certificate was issued to Intercity by the MCHPA until July 29, 1977, when recertification was granted for the period ending September 30, 1977 for the express purpose of negotiating an alternative to the construction of Parkway. On December 22, 1977, the MCHPA informed Intercity that it could not further recertify Parkway. Intercity appealed the MCHPA's refusal to recertify Parkway to the Secretary of the Department of Health and Mental Hygiene, and on December 14, 1978, the Secretary upheld the action taken by the MCHPA. Intercity then appealed the Secretary's determination to the Board of Review, which upheld the Secretary's decision. Intercity appealed the Board's decision to the Circuit Court for Baltimore City and on May 7, 1981, the Board's *281 decision was reversed. On August 12, 1981, Parkway was recertified by the MCHPA for a period of one year subject to the May 8, 1974 recertification conditions. On December 22, 1982, William B. Landis, Executive Director of the Maryland Health Resources Planning Commission, successor to the Maryland Health Planning and Development Agency, which was the successor to the MCHPA, again "decertified" [4] Parkway. Following a three-day hearing, he concluded that Parkway had not been "progressing satisfactorily" and that it failed to conform to the 1970, or the 1973 Comprehensive Health Plans or the 1979-81 State Health Plan. On January 14, 1983, Intercity asked the Health Resources Planning Commission to reconsider the Executive Director's December 22, 1982 decision. That request was denied on March 11, 1983. On January 21, 1983, Intercity also filed an appeal to the Circuit Court for Baltimore City and on January 14, 1985, the Agency's position was affirmed. Intercity asked the Circuit Court for Baltimore City for reconsideration and, *282 after a hearing, that request was denied. Intercity appealed the Baltimore City Court's Order to the Court of Special Appeals of Maryland; the appeal was pending at the time of trial herein. As of the time of trial herein, Intercity has not obtained financing through a tax exempt bond issue sponsored by the State Bond Authority. After 197 Partnership acquired the 122.6062 acres from Edna B. Tidler in December, 1970, 197 Partnership did not expend sums in excess of $2,600 in costs pertaining to the proposed Parkway project. 197 Partnership, from December, 1970 through November, 1974, paid the taxes due on the land and the mortgage interest due on the land acquired from Edna B. Tidler in December, 1970. On August 6, 1975, Edna B. Tidler died. Petitioner and his brother E. Burton Tidler were the personal representatives of their mother's estate. As of the time of trial herein, Intercity had not made any payments on the mortgage for $82,717.80 to Edna B. Tidler's estate, nor had the personal representatives initiated foreclosure proceedings against Intercity. Section 1.170A-1(c)(1), Income Tax Regs., provides, in relevant part, that "[i]f a charitable contribution is made *283 in property other than money, the amount of the contribution is the fair market value of the property at the time of the contribution." The regulations define fair market value as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having a reasonable knowledge of relevant facts." Section 1.170A-1(c)(2), Income Tax Regs. The determination of fair market value is one of fact, based upon the entire record. Symington v. Commissioner,87 T.C. 892, 896 (1986). Petitioner bears the burden of proving this value. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). It is well settled that the fair market value of property "should reflect the highest and best use to which such property could be put on the date of valuation." Symington v. Commissioner,supra at 896. See also Stanley Works and Subsidiaries v. Commissioner,87 T.C. 389, 400 (1986). Petitioner, relying on the appraisal report of Fredric B. Lauterbach ("Lauterbach"), argues that the "highest and best use" of the donated site was for the construction *284 and development of a 250-bed general hospital, valued at $2,267,000.[5] Respondent, on the other hand, relying on the appraisal report of Adolph C. Rohland ("Rohland") and a feasibility study prepared by R. Warren Dacus ("Dacus"), contends that, on the date the gift was made, construction of a hospital on the donated site was no longer a feasible or viable alternative, and therefore could not have been the "highest and best use" of the subject property on November 8, 1974. Instead, respondent argues that the parcel's highest and best use was as a residential home for the elderly, valued at $83,000. Thus, the initial focus of our inquiry, to which we now turn, is whether construction of a hospital on the subject property was even a probable, let alone highest and best, use of the land on the date it was donated. *285 In determining a piece of property's "highest and best use," and in turn its fair market value, "The realistic, objective potential uses for property control the valuation thereof." Stanley Works and Subsidiaries v. Commissioner,supra at 400. See also Olson v. United States,292 U.S. 246, 255-256 (1934); Symington v. Commissioner,supra at 896. Therefore, in making this determination, we look only at "The highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future." Olson v. United states,supra at 255. See also Symington v. Commissioner,supra at 897. That is, as explained by both Lauterbach and Rohland in their appraisal reports, The most profitable likely use to which a property can be put. The opinion of such use may be based on the highest and most profitable continuous use to which the property is adapted and needed, or likely to be in demand in the reasonably near future. However, elements affecting value which depend upon events or a combination of occurrences which, while within the realm of possibility, are *286 not fairly shown to be reasonably probable, should be excluded from consideration. Also, if the intended use is dependent on an uncertain act of another person, the intention cannot be considered. See also Olson v. United States,supra at 257. Accordingly, within the context of this case, petitioner must prove that, on the date of the contribution, construction of a hospital facility on the subject property was not just "within the realm of possibility, [but] fairly shown to be reasonably probable." Olson v. United States,supra at 257. If petitioner fails to meet this burden, we are compelled to exclude consideration of such use from our analysis, for to do otherwise "would be to allow mere speculation and conjecture to become a guide for the ascertainment of value -- a thing to be condemned in business transactions as well as in judicial ascertainment of truth." Olson v. United States,supra at 257. (Citations omitted.)[6]
Based on the evidence we have seen and heard, we think the record clearly reveals that, on November 8, 1974, the *287 date 197 Partnership conveyed the subject property to Intercity, circumstances were such that construction of a hospital facility on the donated site was no longer a realistic, feasible possibility, and therefore not "reasonably probable." While we recognize that, at times prior to November 1974, construction of a 250-bed general hospital on the donated site may well have been not only possible, but even likely, we re-emphasize that determinations as to value must be made in light of the facts and circumstances which exist as of the date the gift is made. We are convinced that the regulatory, financial and demographic support which had initially given rise to the Parkway project and which seemingly had buoyed its progress during its early days, had deteriorated to the point that, on November 8, 1974, the hospital concept was no longer a viable frame of reference. To begin with, based on the Dacus feasibility study [7] (which along with his testimony, we found most convincing), we believe there was no longer a need for the 250 beds which a completed Parkway would have provided. We recognize that in 1971, when Parkway was originally certified, there was a legitimate shortage of hospital *288 beds in the area to be serviced by the proposed hospital. Indeed, that seems to be the primary reason the MCHPA originally certified the project. However, by November 8, 1974, the demographics of the situation had changed radically. Three other hospitals located in Parkway's immediate vicinity, which had also been granted certificates of need by the MCHPA (see p. 6, supra), had leapfrogged past Parkway in the development cycle. Prince George's Doctors Hospital (230 beds) was already under construction and scheduled to open in a year's time, and Greater Laurel Hospital (250 beds) and the Bowie Health Center (176 beds) had already secured permanent financing (which Parkway was unable to do, see pp. 23-27, infra) by way of a bond referendum approved by the voters of Prince George's County during the general election held on November 5, 1974. Thus, in contrast to the situation which had existed in 1971, when it appeared that Parkway and perhaps Prince George's Doctors Hospital would be the only operating hospital facilities in the relevant service area, by November 8, 1974 there were instead three hospitals with a total of 656 proposed beds certain to come on line within the *289 next few years, all before Parkway could open even if it were able to obtain permanent financing and continue construction. As a result, as Dacus' report points out, there was no longer a need for Parkway's 250 beds, since construction of Parkway would have resulted in a total of 906 new beds which was "clearly a level that could not be supported in any rational market analysis of Northern Prince George's County." [8]
*290 Petitioner, however, takes issue with Dacus' conclusions and contends that, notwithstanding the addition of these 656 beds there was still, on November 8, 1974, a demand for the Parkway facility. We do not agree. Lauterbach, petitioner's appraiser, admitted at trial that he performed no independent analysis. Instead, he testified that he relied on the analysis found in a feasibility study prepared in early 1975 by the accounting firm of Laventhol, Krekstein, Horwath & Horwath (the "Laventhol Report") for AMI, which he had attached to his report. At trial, however, over petitioner's objections, we admitted the attached report only for the limited purpose of indicating that Lauterbach did in fact rely on it in preparing his appraisal. While we recognized that appraisers often rely on hearsay evidence, we concluded that, due to the critical importance of this evidence to the instant case, it should not be accepted for the truth of the matter asserted within it. We stand by that view. [9]
*291 As our analysis thus far has clearly shown, one of the pivotal issues raised in this case is whether it was still feasible to build Parkway, given the situation as it existed in November, 1974. Respondent, realizing this issue's importance, commissioned Dacus to extend his analysis and to testify at trial. Petitioner, on the other hand, who bears the burden of proof herein, chose only to rely almost exclusively on the Laventhol Report attached to the Lauterbach appraisal. Although the Laventhol firm is still in existence, petitioner's counsel did not see fit to present a representative of that firm to testify at trial, thus depriving respondent of the opportunity to counteract petitioner's evidence by means of cross-examination as petitioner was able to attempt to accomplish by cross-examining respondent's experts.[10] Thus, to allow the Laventhol Report into evidence for the purpose petitioner seeks would be to confer an unfair advantage on petitioner. Cf. Gerling InternationalInsurance Co. v. Commissioner,86 T.C. 468, 477 (1986). While the Federal Rules of Evidence allow an appraiser to rely on some types of hearsay in preparing his appraisal, see Rule 703, Federal Rules of Evidence *292 , it is clear that such "hearsay evidence is to be considered solely as a basis for the expert opinion and not as substantive evidence." United States v. Sims,514 F.2d 147, 149-150 (9th Cir. 1975). [11] We recognize that Lauterbach offered some testimony that he had independently evaluated the Laventhol Report and offered his own opinion that the analysis contained in that report was accurate. But Lauterbach's testimony in this respect was most general in nature. We found it unconvincing, particularly since Lauterbach's own appraisal was predicated on at least two assumptions which were factually incorrect on November 8, 1974, namely (1) that the property had been approved by the Washington Suburban Sanitary Commission for the extension of sewer and water mains to service the proposed facility, [12] and (2) that a permanent loan commitment for financing the proposed hospital had been obtained. The effect of these two obvious critical assumptons is obvious. Indeed, they cause Lauterbach's testimony to be open to serious question, even if, contrary to our previously enunciated view, we were to consider the Laventhol Report as constituting substantive evidence. *293 Additionally, we note that, prior to November 8, 1974, the efforts to obtain private financing for Parkway had failed and its sponsors had clearly come to the conclusion that a for-profit hospital was not in the cards and had converted the project into a not-for-profit endeavor in order to be eligible to seek public financing. We find it difficult, under such circumstances, to evaluate the project, as the Lauterbach and the Laventhol reports did, on the basis of a projected income stream to be produced by a facility to be privately financed and designed to produce a profit. To accept such an analysis would, in light of the facts herein, be a contradiction in terms. A brief review of the circumstances surrounding Parkway's recertification lends additional support to our conclusion that the construction of the hospital was no longer feasible at the time the gift was made. As we indicated, supra at p. 5, Parkway was recertified on May 8, 1974 for a period of only one year, subject to stringent conditions imposed by the MCHPA. Moreover, the MCHPA warned Intercity, "so that no question can be raised concerning future actions of this Agency," that all conditions and stipulations *294 specified in the certificate of need were to be met, and that Intercity was required to file quarterly reports (i.e., every 3 months) with the agency as to its progress in meeting them. In a letter, dated August 20, 1974, the MCHPA notified Intercity that its progress in meeting two of the aforementioned conditions had been unsatisfactory. Most notably, and relevant to our inquiry herein, the MCHPA expressed grave concern over Intercity's failure to secure, as promised at its recertification hearing, adequate permanent financing to complete the project. As the MHPAC explained: Your presentations before HPAC [13] and this Agency in April and May of this year clearly indicated that Recertification of the Parkway project would immediately be followed by the closing of financial arrangements and the commencement of construction. We now find that although more than 90 days have elapsed since Recertification, financial arrangements are still pending and, except for superficial clearing of the site, construction has not yet begun. * * * Please be advised that unless evidence of a signed construction contract is provided within the next sixty days, this Agency will seriously reconsider *295 its May 8 decision to recertify the project. Although Intercity provided the MCHPA with proof that it had entered into a construction contract with Volpe Construction, construction ceased in September, 1974 and has never resumed. Moreover, by the time 197 Partnership contributed the land on November 8, 1974, Intercity had still not obtained permanent financing, nor any assurances of such through either conventional or governmental means. [14] While it is true that Intercity (and/or AMI) had already engaged in discussions with the State *296 Bond Authority in an attempt to obtain tax-exempt bond financing, Intercity's application was not submitted to the Authority until April 7, 1975, and was not accepted for review until April 16, 1975. The Laventhol Report, which AMI had commissioned as a supporting document to its application, was not completed until January, 1975. Thus, at the time the gift was made, Intercity's efforts to secure public financing, apparently the only type of funding still even potentially available for the project, were, to say the least, quite preliminary in nature. *297 Moreover, the State Bond Authority's acceptance of Intercity's application should not be viewed as a confirmation of the fact that Intercity's chances of obtaining public financing were likely or even predictable as of November 8, 1974. As was set out clearly in its notification letter dated April 18, 1975, the State Bond Authority's acceptance of Intercity's application (let alone its approval of such) was premised on the receipt of all required governmental approvals for the construction of Parkway Hospital, including, without limitation, timely recertifications by the Maryland Comprehensive Health Planning Agency, such approvals to be in final form and not subject to further appeal or review. [Emphasis added.] Furthermore, that letter went on to say that, the Authority's acceptance of such application letter shall not be deemed to constitute in any way a determination by the Authority that the Parkway Hospital project is feasible or will in fact be consummated and although the Authority will keep Intercity Hospital Corporation advised, from time to time, of the Authority's opinion in regard to the possibility of successfully financing the Parkway Hospital project *298 by the Authority, the Authority does not guarantee such successful financing or in any way represent that funds for permanent financing of the Parkway Hospital project are or will become available. Accordingly, we think it is quite apparent that, as of November 8, 1974, Intercity's prospects of securing permanent financing acceptable to the MCHPA, were murky at best. Intercity's attempts to obtain these funds through the "limited partnership concept," see p. 6, supra, as well as through more conventional financing techniques, see note 14, supra, either had not been successful or had been rejected as unacceptable by Intercity/AMI. Moreover, as of November 8, 1974, Intercity had not even filed an application with the State Bond Authority, let alone received approval for the use of public funds. While we acknowledge that technically such funding was still a possibility, we think Intercity's chances of obtaining such approval (or even a level of commitment satisfactory to the MCHPA), even by May 8, 1975 (the date its one-year certification expired), must be viewed as highly improbable as of November 8, 1974. Thus, given the unlikelihood of Intercity's securing any type of *299 permanent financing, when coupled with the cessation of construction in September, 1974, and when viewed in light of the sternness of the MCHPA warning in its letter of August 20, 1974, we think it was predictable on November 8, 1974 that the MCHPA would, more likely than not, refuse to recertify Parkway -- which is what in fact occurred in June, 1975. As the MCHPA explained in the letter denying Parkway's recertification, dated June 5, 1975, Based upon our review, we now find that inadequate progress has been demonstrated by the applicant in meeting specific Conditions of Recertification, which were imposed on May 8, 1974, as follows: Condition 1 - Financing of the project Page 6 of Parkway Medical Center's FinalProgress Report, dated April 3, 1975, states * * * "the original conventional financing * * * has been allowed to lapse." Inasmuch as the project was Recertified on May 8, 1974 for a full year in large part due to the imminence of construction based upon such conventional financing, it is our judgment that this Condition has not been adequately addressed during the Recertification period. We acknowledge that the applicant is negotiating with the Maryland *300 Health and Higher Educational Facilities Authority for more reasonble financing. However, prior statements by the applicant had clearly indicated the intent of Intercity Hospital Corporation to proceed with construction of the facility on the basis of the approved conventional financing, reverting to less costly financing if it becomes available, either before or after the completion of construction. The failure of the applicant to proceed under conventional financing, and the virtual stoppage of construction since late fall, 1974, indicate to this Agency that the applicant has not proceeded in accordance with his assurance made prior to the last Recertification. [15]
*301 In view of the foregoing, we conclude that, as of November 8, 1974, that Parkway's use as a hospital-for-profit was no longer the highest and best use of the donated land. [16] In fact, we think that its use as a hospital either on a for-profit or a not-for-profit basis was not in the cards, whether the project was to be implemented by Intercity or by anyone else. We now move on to a consideration of what was the "highest and best use" of the donated site and, in turn, its fair market value on the date it was contributed to Intercity. *302 Unfortunately for petitioner, his appraiser (Lauterbach) based his entire analysis on the assumption that the "highest and best use" of the Parkway site was for the construction of a hospital. Lauterbach failed to consider any other possible use for the property and, as a result, we are left with a situation in which petitioner has in effect provided us with no proof as to the value of the contributed property based on any other use -- a burden which we have already emphasized falls squarely on his shoulders. See p. 13, supra. Therefore, in arriving at our decision herein, we have necessarily relied on the appraisal report of respondent's expert (Rohland). We have, of course, taken into consideration petitioner's criticism of that report, although, as will become clear from our analysis, this criticism has had little effect on our decision herein. Rohland, in contrast to Lauterbach, [17] used a comparative value approach in valuing the subject property; i.e., he ascertained the value of the Parkway site by analyzing sales of comparable pieces of property in the same general geographic area. The neighborhood in which the contributed parcel was located was zoned R-R (rural-residential) *303 -- a zoning classification which prohibited commercial construction and which basically limited use of land to agricultural uses, home dwellings, houses of worship, etc. Rohland, however, based on his review of the Approved and Adopted Master Plan for the Laurel-Montpelier Planning Area, considered one of the "highest and best uses" for the subject property to be as a group residential facility for the elderly, a use which Rohland mistakenly believed required a special exception as of November 8, 1974. [18] Rohland purposely chose a use which required such an exception, reasoning that, if Intercity had already been granted a special exception to build a hospital, the county planning board would probably be willing to grant an exception even if it was for a different but similar type of special use. Rohland felt this was an important element for he considered that the ability to obtain an exception increased the value of the land. Thus, in choosing his comparables, Rohland tried to choose sales of property which his research revealed were purchased with a potential for obtaining such a special exception, as well as sales of property to be used by religious organizations which, although *304 not requiring a special exception, his experience suggested commanded a higher price than normal residential sales because they were made in contemplation of uses out of the norm in a residential neighborhood. Thus, Rohland, in performing his analysis, arrived at a value higher than he would otherwise have determined if he had focused solely on sales of more typical residential use properties, e.g., home dwellings. While we agree with petitioner that the particular special use chosen by Rohland was not yet provided for as an eligible category in the county zoning ordinance in 1974, we think that the conceptual basis upon which he chose to value the land, i.e., as if it had potential for special use, constituted a quite sound approach, and a method which in fact benefits petitioner. [19]
*305 The following table reflects the comparable sales upon which Rohland based his conclusions: Sale
Date
Price
No.
of Sale
Grantor
Grantee
Per Acre
1
6/30/71
India Barton
Barton Joint Venture
$8,681
2
9/30/71
Potomac Conference,
Medical Group
9,891
Seventh Day Adventists
Foundation
3
6/2/73 Levitsky/Greco
Prince George's
14,982
Doctors Hospital
4
11/8/73 Edna B. Tidler
Potomac Conference,
10,000
Seventh Day Adventists
Rohland estimated, based on these sales, that the subject property had a per-acre value of $14,900 or a total value of $224,100. However, the comparables, upon which he based his estimate, were all located on major thoroughfares with sewer and water service already available. The subject property, on the other hand, lay some 1,280 feet off a major highway on a dedicated but unconstructed street (Medical Center Drive) and, while sewer and water service had generally been approved, the applications for such service had in fact been denied because the Parkway Sewage Treatment Plant extension had not yet been completed and there was no way of estimating when it would be available. *306 See note 12, supra. Eventually, a $100,000 contribution for such service to the Washington Suburban Sanitary Commission would be required. Accordingly, Rohland reduced the property's value by the costs attributable to bringing sewer and water to the parcel ($100,000) and of constructing Medical Center Drive ($41,125). [20] As a result, Rohland estimated the value of the property, net of the above costs, to be approximately $83,000. Petitioner, relying on Lauterbach's testimony, disputes Rohland's value estimate, claiming that the above sales were not comparable to the donated site because none of these properties (other than the property involved in Sale No. 3) had been granted a certificate of need or a special exception to construct a hospital, and thus did not represent sales of properties on which a hospital could legally be built. Once again petitioner misses the point. There was no need *307 for Rohland to seek out or evaluate comparable sales of potential hospital sites for the simple reason that, as we have already concluded, see pp. 16-28, supra, construction of a hospital facility was not even a possible, much less probable, use of the property as of November 8, 1974. Petitioner also argues that, with the exception of Sale No. 4, none of these transactions were negotiated at arm's length. Rohland, however, we think quite adequately, countered these criticisms by explaining, without objection by petitioner's counsel, that he had personally spoken with Mrs. Barton who had verified to him that Sale No. 1 was indeed an arm's-length transaction. Similarly, although it is not entirely clear whether the principals involved in Sale No. 2 were related entities (a fact which, even if true, does not in and of itself prove that the sale was not freely negotiated), Rohland testified that it was later resold in 1972 to the Saint Gregory Byzantine Catholic Church, an independent third party, for $10,240 per acre. With respect to Sale No. 3, we agree with petitioner that this transaction may not have been the product of arms-length dealings (Dr. Levitsky was the owner of Prince *308 George's Doctors Hospital) and, as a result, may have understated the true value of the land at the time it was transferred. We also note, that since this transaction constituted the sale of a property upon which a hospital facility was likely to be constructed, a potential use which we have found was not attributable to the subject property, it can be argued that it was not a comparable sale and should not have been considered. We have concluded, however, that Sale No. 3 should not be excluded from our consideration because it seems to us that, without it, Rohland's figure as to the value of the subject property should be reduced, an action which would be detrimental to petitioner and which respondent has not asked us to take. A similar prejudice to petitioner's position would occur if we eliminated Sales Nos. 1 and 2 on the ground that they were too remote in time. Accordingly, while we feel Rohland's appraisal left something to be desired (for example, he failed to detail in his report in what manner he adjusted and weighed each of the comparable sales so as to arrive at his $14,900 per-acre figure, compare Symington v. Commissioner,supra), in light of *309 petitioner's failure to offer us any evidence to the contrary, we think it adequately reflected the fair market value of the subject property. Thus, we conclude that this value, on November 8, 1974, was $83,000 based upon $14,900 per acre and after taking into account the costs of sewer and water and of constructing a roadway.[21] We are not unaware of the fact that this value is far less than that claimed by petitioner. But this result stems from the fact that petitioner posited his entire case on a "highest and best use," which we have rejected, and did not see fit to offer any evidence in support of an alternative position. As a consequence, petitioner falls squarely within our admonition in Buffalo Tool & Die Mfg. Co. v. Commissioner,74 T.C. 441, 452 (1980), that each of the parties should keep in mind that, in the final analysis, the Court may find the evidence of valuation by one of the parties sufficiently more convincing than that of the other party, so that the final result will produce a significant financial defeat for one or the other, rather than a middle-of-the-road compromise which we suspect each of the parties expects the Court to reach. * * *310 * Finally, we must determine the amount of the contribution to which petitioner is entitled. Respondent argues that the $83,000 value should be offset by the mortgage held by Edna B. Tidler in approximately the same amount, which still encumbered the property at the time it was transferred to Intercity. [22] Petitioner, on the other hand, argues that, notwithstanding the fact that Intercity received the property subject to the mortgage, he is entitled to his full deduction (i.e., his prorata share of the $83,000 value we have attributed to the property). *311 It is well settled that "When a gift to a charity of property subject to an encumbrance is made, the amount of the deduction is the donor's equity in the fair market value of the property, or the difference between the fair market value of the property and the amount of the encumbrance thereon." Scott v. Commissioner,61 T.C. 654, 662 (1974). See also Laughinghouse v. Commissioner,80 T.C. 425, 430 (1983); Guest v. Commissioner,77 T.C. 9, 25 (1981). This is so because normally when a grantor donates property subject to a mortgage not only does he dispose of the property but he also rids himself of the mortgage obligation which attaches to the land. Accordingly, this relief from indebtedness is treated as an amount realized which offsets the charitable deduction. This is true even if the grantee does not assume personal liability and merely takes the property subject to the mortgage. [23] See Crane v. Commissioner,331 U.S. 1 (1947); Johnson v. Commissioner,59 T.C. 791, 808-812 (1973) affd. 495 F.2d 1079 (6th Cir. 1974). [24]
*312 Petitioner does not dispute that this is typically the case. However, he argues that the present situation is different because 197 Partnership transferred the property by special warranty deed, and accordingly, under Maryland State law, 197 Partnership remained liable on the mortgage even after the conveyance. [25] Therefore, he contends, there was no relief from indebtedness and thus no offsetting benefit translating into an amount realized. We agree with petitioner that, under Maryland law, a special warranty imposes an obligation on the grantor to protect the grantee against adverse claims (created by the grantor), which might impair the grantee's title in the land, (see Erlewine v. Happ,39 Md. App. 106, 383 A.2d 82, 84 (Spec. App. 1978); Kendall v. Rogers,181 Md. 606, 31 A.2d 312, 314 (1943)), such as an outstanding mortgage indebtedness on the date of transfer. Nevertheless, we conclude that, given the facts and circumstances of the instant case, the amount of 197 Partnership's contribution should be reduced by the amount of the mortgage indebtedness. *313 We find it unnecessary to wend our way through the thicket of problems involved in determining whether the transaction herein involved a sale as respondent contends [26] or the precise nature of the special warranty deed, i.e., a primary obligation of 197 Partnership to make payments to the mortgagee [27] as they became due or to guarantee or indemnify Intercity by way of reimbursement after Intercity made the payments or to pay Intercity damages in the event of foreclosure. The fact of the matter is that the donated property remained subject to the mortgage and to foreclosure by the mortgagee in the event of nonpayment. Indeed, we believe that the mortgagee would at the very least be required first to pursue foreclosure before seeking any recovery from 197 Partnership. See notes 23 and 27, supra.In the foregoing context, we find it difficult to conclude that the value of the property should not be reduced by the amount of the mortgage obligation in order to determine the amount of the contribution by 197 Partnership to Intercity. To be sure, Intercity's exposure to loss may have been ultimately eliminated by the obligation of 197 Partnership under the special warranty, but *314 it is clear that this obligation was one "in futuro" and, although it ran with the land, would not be considered breached until an adverse claim was made against the property. See Marathon Builders, Inc. v. Polinger,263 Md. 410, 283 A.2d 617, 620 (1971); 6A Powell, Law of Real Property, par. 899 (1986). Furthermore, under Maryland law, the measure of damages for breach of a warranty of title is limited to the consideration paid for the property plus interest and costs of enforcement of the warranty at the discretion of the finder of fact. See Reamer v. Kessler,233 Md. 311, 196 A.2d 896, 899-900 (1964); Wlodarek v. Thrift,178 Md. 453, 13 A.2d 774, 781 (1940). See also generally, 6A Powell, Law of Real Property, supra; 4 Tiffany, Law of Real Property, sec. 1017 (3d ed. 1975); 21 C.J.S., Covenants, sec. 148 (1940). In light of the foregoing, we conclude that the special warranty was, at best, a promise to make payments at some point or points of time in the future and that such a structure does not give rise to a charitable contribution until payment is actually made. [28] Cf. Guren v. Commissioner,66 T.C. 118 (1976). *315 In sum, we hold that respondent's determination that petitioner is not entitled to a charitable deduction based upon the gift *316 to Intercity by 197 Partnership should be sustained. [29]
To reflect the concessions of the parties on other issues, Decision will be entered under Rule 155.
Footnotes
1. In the statutory notice, dated July 2, 1984, respondent determined a deficiency for 1974 of only $7,626. In an amended answer, dated September 5, 1985, respondent determined an additional deficiency for 1974 in the amount of $23,647.54. The increase is based upon respondent's claim that the fair market value of donated land as determined in the deficiency notice should be reduced by an alleged encumbrance. ↩
2. The deficiencies for 1975 through 1979 are based, aside from items that have been settled by the parties, upon a carryover of the excess of the fair market value of the land, as claimed by petitioner, over the allowable charitable deductions in 1974.↩
3. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
4. This is the term used in the stipulation of the parties. It would seem that the one-year certification had simply expired in May of 1982.↩
5. Lauterbach employed a land residual technique in arriving at this figure. Simply put, under this method of valuation, the appraiser, utilizing discounted forecasted net income streams, first estimates the market value of a completed and operating hospital, and then, after subtracting out the total cost of completing the project, including developer profit, arrives at a residual land value. We note that the view has been expressed that "[t]he land residual technique * * * leaves much to be desired." See Crosswhite v. United States,438 F. Supp. 368, 375↩ (D. Ore. 1977).
6. See also Fiske v. Commissioner,T.C. Memo. 1984-494↩.
7. Dacus, in fact, prepared 2 written reports. The first, which was prepared in March 1976, was an evaluation of the feasibility of building Parkway as of June 18, 1974. In the second study, prepared for purposes of the instant litigation and dated September 13, 1985, Dacus merely extended his analysis from June 18, 1974 until November 8, 1974. Hereinafter, any reference to the Dacus study or report refers to the combined information contained in both reports. ↩
8. We note that, in his report, Dacus also suggests that, given the population distribution in Prince George's County, the approval by the MCHPA of even the 656 additional beds was illadvised and not truly sensitive to the county's health care needs. Moreover, although Dacus acknowledged that the willingness of doctors (presumably on staff) to bring their patients to a preferred hospital can buoy that hospital's occupancy rates and make it successful despite an absence of demographic support, he concluded, based on evidence he had gathered and which is found in his report, that no such physician support existed in Parkway's case.↩
9. In a similar vein, we are also convinced that the Beers-McGinniss appraisal report, which was attached to 197 Partnership's 1974 tax return, was properly excluded from evidence. That "report," actually consisted of only a 2-page letter summarizing the Beers Brothers, Inc.'s findings that, upon reviewing an appraisal report prepared by Robert and Judith McGinniss (date unknown) and after inspecting the site and the plans relative to its development, the land's value for hospital use was $2,240,000. In view of the summary nature of this "report," plus the fact that no copy of the McGinniss appraisal or the full Beers Brothers, Inc. report was attached to the letter, we reject this "report" as the purest type of inadmissible hearsay, even if, as petitioner contends, the preparers of that "report" have met their demise.↩
10. Petitioner, for the first time on brief, argues that he is a victim of time -- that the data used to prepare the Laventhol Report has long since been discarded and that the people who compiled the data and prepared the report are no longer with the firm. Even if they could be located, petitioner adds that they would have nothing to refer to. Petitioner, however, has presented no evidence to support these claims (or even to detail his efforts), and accordingly we afford them little weight. Moreover, in taking this position, petitioner over-dramatizes the difficulties in obtaining the evidence he might have been expected to produce. Granted that witnesses were no longer available to testify in detail as to the matters covered by the Laventhol Report, we find it hard to believe that there was no one from the Laventhol firm who could have given testimony as to the methodology used in the report, etc., which would have provided a minimal foundation upon which to admit the report into evidence. We should add that, to the extent the foregoing represents an effort by petitioner to use difficulties in obtaining evidence as a basis for ameliorating his burden of proof, such effort must be rejected. Burnet v. Houston,283 U.S. 223↩ (1931). 11. We note that petitioner's counsel was advised at trial that, absent the presentation by Lauterbach of additional evidence to corroborate the data contained in the Laventhol Report, or the submission of some type of other admissible evidence to the same effect, he risked the exclusion of the information contained therein from consideration by the Court -- information which he was well aware was pivotal to his case. Furthermore, we also reject petitioner's contention that admission of the Laventhol Report falls within the hearsay exception of rule 803(6) or 803(24) of the Federal Rules of Evidence. Given that the Laventhol Report was commissioned by, and prepared specifically for, AMI as support for its application to the State Bond Authority (see p. 24, infra), we think it is clear that the report was not a "record of regularly conducted activity," as defined under rule 803(6). Cf. Palmer v. Hoffman,318 U.S. 109 (1943). Moreover, for the reasons discussed in the preceding paragraph and supra at pp. 18-21, we conclude that the Laventhol Report is not entitled to a general hearsay exception under Rule 803(24). See also note 10, supra.↩
12. Parkway's requests for water main and sewer extensions to service the proposed facility were generally approved by the Washington Suburban Sanitary Commission, in a letter dated May 17, 1973, but such approval was made conditional upon the completion of the expansion of the Parkway Sewage Treatment Plant.↩ Thereafter and no later than November 12, 1973, these requests were denied pending completion of the plant. As of November 8, 1974, the Parkway Sewage Treatment Plant expansion had not only not been completed, but its final completion date was at that time still too tentative to even be predicted.
13. HPAC is the acronym for the Health Planning Advisory Committee of Prince George's County, a local planning body which made recommendations to the MCHPA with respect to health care facilities, in an attempt to coordinate local and statewide health service needs. Although the HPAC had supported the Parkway project at the time it was originally certified, it recommended, in a letter dated March 28, 1974, that further certification by the MCHPA would not be justified or be in the best interests of the citizens of Prince George's County. As evidenced by the May 8, 1974, recertification, the MCHPA declined to follow the HPAC's recommendation.↩
14. In fact, through the help of Madison National Bank, in January, 1974, Intercity had secured a commitment from the Builder's Investment Group (a real estate investment trust) for a 3-year construction loan to be followed by a 3-year "minipermanent" mortgage. However, at AMI's insistence (and as a precondition to its involvement in the project), in July, 1974 Intercity rejected this financing because of AMI's concern that the terms of the loans were much too onerous (e.g., interest was to be charged at 5 1/2 points above the prime rate) and because AMI felt that there were too many risks attached in obtaining the funds from a real estate investment trust.↩
15. We are aware that, since the MCHPA's decision to deny recertification occurred some 7 months after the gift of the property was made, it could be argued that such information should not influence our decision herein as to the property's value. However, while we are mindful that our analysis must be based on the circumstances as they existed on November 8, 1974, and not on factors derived from hindsight, see Taube v. Commissioner,88 T.C. 464, 488↩ (1987), we think that, within the context of the situation in the instant case, the MCHPA's decision is highly relevant and should be considered in that it confirms what we think should have been quite obvious to Intercity even 7 months earlier, namely, that, as of November 8, 1974, given Parkway's tenuous financial situation and the cessation of all construction, it was likely that the MCHPA would not recertify the project.
16. Petitioner, in further support of his argument that use of Parkway as a for-profit hospital was still a realistic, feasible possibility, offered the testimony of Dr. Levitsky, the original owner and operator of Prince George's Doctors Hospital, who testified that he always considered Parkway a viable undertaking. In this regard, Dr. Levitsky testified that, in 1975, he offered to build Parkway for Dr. Offen for a flat fee of 13 million dollars, from which he expected to realize a 2 million dollar developer's profit. However, we do not think Dr. Levitsky's offer, or ability, to so construct Parkway in any way speaks to the issue of whether that facility was in fact needed and would have been successful. Dr. Levitsky also testified that, after Parkway was recertified in 1981, see p. 11, supra,↩ he offered somewhere between 2.1 and 2.6 million dollars to AMI in an attempt to purchase the land, so that he might build the facility. Putting aside the fact that there is no corroboration in the record of this purported offer (Dr. Levitsky testified that it was orally communicated by an agent of his to AMI), we note that Dr. Levitsky made it clear that such an offer was conditional on permanent financing for the facility being available -- a condition which, as far as the record herein shows, could not have been satisfied. Moreover, the fact that such an offer may have been made in 1981, 7 years after the gift was made, is hardly relevant to our decision herein.
17. See note 5, supra.↩
18. A group residential facility for the elderly, which would fall under the category of "Group residential facility for more than eight (8) dependent persons," see sec. 27-189, of the Zoning Ordinance of Prince George's County, was not added as a category of special exception use in an R-R zone until 1977. ↩
19. For example, we are of the opinion that Rohland could have just as effectively argued that the "highest and best use" of the property was as a site for the construction of more typical residential dwellings, which would have surely resulted in a lower fair market value.↩
20. The actual projected cost of constructing the street was $82,250 (2,350 linear feet X $35 per linear foot). However, Rohland assumed that 197 Partnership, which owned adjacent property which would benefit from access to Medical Center Drive, would pay one-half of this cost.↩
21. We think that our conclusion also finds support in the fact that in July, 1976, 197 Partnership settled its claim against the United States Government, for a taking on June 18, 1974 (less than six months prior to the gift herein) of 45.8683 acres of the same tract in which the subject property was located, for $10,000 per acre. Granted that there may have been different considerations involved, we find it impossible to conceive of differences which would account for the huge discrepancy between the $10,000 per acre accepted by the donor herein and the approximately $150,000 per acre value claimed herein.↩
22. Respondent first raised this issue in his amended answer in which he determined an additional deficiency in the amount of $23,647.54. See note 1, supra.↩ Accordingly, respondent has the burden of proof as to this issue. Rule 142(a).
23. We note that the mortgage contains an exculpatory clause which specifically provides that, in the event of default, the mortgagee "shall look to the property herein as the sole security for the mortgage debt." ↩
24. See also sec. 1.1011-2(a)(3), Income Tax Regs., which provides that, in the case of a "bargain sale," "[i]f property is transferred subject to an indebtedness, the amount of the indebtedness must be treated as an amount realized for purposes of determining whether there is a sale or exchange to which section 1011(b) and this section apply, even though the transferee does not agree to assume or pay the indebtedness." (Emphasis added.) Although 197 Partnership's gift to Intercity did not constitute a "bargain sale," since the amount of the mortgage indebtedness did not exceed the partnership's basis in the property, compare Ebben v. Commissioner,783 F.2d 906, 911-913 (9th Cir. 1986), affg. a Memorandum Opinion of this Court, and Guest v. Commissioner,77 T.C. 9, 19-26↩ (1981), the conceptual rationale behind this section of the "bargain sale" regulations is still applicable generally to the situation found in the case herein. See Whitaker, "Dealing with Outright Gifts to Charity in Kind," 30 Ann. N.Y.U. Tax Inst. 45, 73-75 (1972).
25. Section 2-106 of the Real Property article of the Annotated Code of Maryland (1981) provides: Sec. 2-106. Effect of special warranty. A covenant by a grantor in a deed, "that he will warrant specially the property hereby granted," has the same effect as if the grantor had covenanted that he will warrant forever and defend the property to the grantee against any lawful claim and demand of the grantor and every person claiming or to claim by, through, or under him.↩
26. Given the equivalence of the amount of the mortgage, which effectively represented the cost basis of the donated land to 197 Partnership, and the fair market value of that land, there is no gain or loss involved even if we were to find that a sale occurred. See note 24, supra.↩
27. It seems highly doubtful that the mortgagee could have sued 197 Partnership directly on the special warranty as a third party beneficiary. See generally, 4 Tiffany, Law of Real Property, sec. 1022 (3d ed. 1975); 21 C.J.S., Covenants, secs. 81, 82 (1940). ↩
28. We express no opinion as to whether any such payments on the mortgage herein would in fact constitute as charitable contributions in view of the presence of the obligation under the special warranty deed, although as we have noted, that obligation may have been severely limited under Maryland law because of the absence of consideration. Moreover, we note that there is no evidence in the record herein that any payments were made in the mortgage by anyone after November 8, 1974. See also note 26, supra.↩
29. Petitioner has also claimed, for the first time on brief, that he is entitled to an additional deduction to reflect 197 Partnership's alleged forgiveness in 1977 of the $100,000 loan made to Intercity on July 16, 1974. See p. 8, supra.↩ However, even if we ignore the lateness of petitioner's claim, we reject his argument because not only has he offered no proof that the loan was in fact forgiven, but, in any event, he would not be entitled to a deduction in 1974 for a debt not forgiven until 1977.