MIKE DOUGLAS and VASILIKI DOUGLAS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Douglas v. Commissioner
Docket No. 49019-86
United States Tax Court
T.C. Memo 1989-592; 1989 Tax Ct. Memo LEXIS 590; 58 T.C.M. (CCH) 563; T.C.M. (RIA) 89592; October 30, 1989
John Gigounas and Edward B. Simpson, for the petitioners. Charlotte Mitchell, for the respondent. PARR
MEMORANDUM FINDINGS OF FACT AND OPINION PARR, Judge: Respondent determined deficiencies and additions to tax in petitioners' joint individual Federal income tax as follows: Additions to Tax
Year
Deficiency
Sec. 6651(a)(1) [1]
Sec. 6653(a)(1)
Sec. 6653(a)(2)
1981
$ 54,683.36
$ 2,734.00
$ 3,728.00 *
1982
12,349.04
-
617.00 *
1983
44,746.50
-
2,277.00 *
*594 Three of the adjustments determined in the statutory notice of deficiency have been conceded and are no longer in dispute. After concessions the issues for decision are (1) whether petitioners made a charitable contribution of a 20-percent interest in certain real estate to a Greek Orthodox Church in 1981; or in the alternative, whether petitioners made a bargain sale of 100 percent of the property in 1983; (2) whether petitioners are entitled to fully deduct rental expenses on the property; and, if not, whether $ 4,200 of the amount disallowed in 1982 is deductible as a charitable contribution in 1982; (3) whether petitioners are entitled to a $ 30,000 charitable deduction in 1983; (4) whether petitioners are liable for additions to tax under section 6651(a)(1) for 1981; and (5) whether petitioners are liable for additions to tax under sections 6653(a)(1) and (a)(2) for calendar years 1981, 1982, and 1983. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and related exhibits are incorporated herein by this reference. Petitioner Mike Douglas (Mr. Douglas) and petitioner Vasiliki Douglas (Mrs. Douglas) filed their *595 joint Federal income tax returns for calendar years 1981, 1982, and 1983. Petitioners reported their income under the cash receipts and disbursements method of accounting for all years in issue. Petitioners resided in Atherton, Calif., at the time they filed their petition with this Court. Mr. and Mrs. Douglas are both Greek immigrants. Mr. Douglas received a third grade education prior to coming to the United States in 1959. He cannot read and write English. His father owned a grocery warehouse in Greece and once a week gave away food to the poor. Likewise, he raised Mr. Douglas to help the poor, to help others, to help the Church, and to help his country. Mr. Douglas visited Costa Rica for a time, where he was strongly impressed by the fact that the Greek community there had no church and no priest to baptize their babies or to give them communion. He resolved then that he would always help the Church when he was able to. Upon his return to the United States, Mr. Douglas opened a hamburger stand. He worked hard, his business was successful, and he soon owned a number of restaurants. He also made wise real estate investments and eventually became wealthy. Mrs. Douglas *596 came to the United States in 1966, and graduated from high school here. Since Mr. Douglas is unable to read and write English, she has handled all their business affairs. Prior to 1981 petitioners sold a house to a Mrs. Weaver. Mrs. Weaver gave petitioners a note, due and payable within one year of the sale. Interest, however, could be paid separately. On or around January 1, 1981, petitioners received a $ 92,000 interest payment from Mrs. Weaver. Petitioners inadvertently failed to make any record of such payment and by the close of their 1981 taxable year no Form 1099 had been received with respect to such payment. Petitioners purchased a Certificate of Deposit with the $ 92,000 since, by doing so, they would earn a greater return on their money than they would otherwise earn by placing it in their checking account. In 1981 petitioners were members of the Greek Orthodox Church in Belmont, Calif. In the early part of 1981, petitioners were approached by their own pastor, Father Stevens, in hopes that they would join a few other wealthy Greek couples in helping to finance the building of a Greek Orthodox church in Marin County, Calif., for another congregation. Petitioners *597 readily agreed to contribute $ 120,000. However, for some reason, their gift was not accepted by the Marin County congregation. Petitioners were hurt and disappointed by this, but told Father Stevens that if someone else needed their help they would gladly give it. Shortly thereafter, Father Stevens asked Mr. Douglas if he would be willing to help a Greek community in Santa Cruz, Calif. that did not have a permanent place of worship and were in need of a building of their own. The Santa Cruz Greek community had no wealthy members and the church was unable to afford to purchase its own building; therefore, it had been holding services in borrowed space from other churches in the area, including the Seventh Day Adventist Church. Mr. Douglas was pleased to help. Father Stevens contacted Father John Karastamatis (hereinafter referred to as Father John), and informed Father John that Mr. Douglas would be willing to help the Church. Father John was the spiritual leader and head of the Prophet Elias Greek Orthodox Church of Santa Cruz from the time of its formation until his death in 1985. The Prophet Elias Greek Orthodox Church (the Church) is an exempt, nonprofit religious organization *598 under the provisions of section 501(c)(3) and charitable contributions to it qualify for the maximum charitable deduction under section 170(a). In October or November of 1981, Father John and Jim Peterson had already located a former funeral home in Santa Cruz which the church community wanted to purchase as their place of worship. At the first meeting Father John told petitioners that the Church was interested in acquiring the Santa Cruz property (the property). The sellers, Mr. and Mrs. Hogg, had originally listed the property for about $ 750,000, but Father John had negotiated the sales price down to $ 545,000. The initial plan was for petitioners to make the down payment on the property with the Church paying the remainder of the purchase price. At the second meeting, petitioners met with the sellers and Father John and discussed their initial proposal. However, because the Church was so small and lacked the financial wherewithal, the Hoggs would not sell the property directly to the Church. Petitioners agreed to put up the initial down payment and further agreed to co-sign on the loans with the Church to finance the rest. However, this arrangement was also eventually *599 set aside, since the Church was still in no position to refinance the $ 109,190.23 first mortgage (County Bank mortgage) which was due in full in June 1982. Because Mr. Douglas believed the Church was making a wise investment, petitioners agreed to purchase the property for the benefit of the Church and to lease the building back to the Church for $ 2,000 per month, beginning January 1982; the Church to repurchase the property when it could afford to make the mortgage payments. It was also part of the parties' agreement to have the Church pay off the County Bank mortgage when it came due in June 1982. The Hogg notes would then move up into first, second, and third positions, and petitioners would give a fourth mortgage for the difference between their down payment and the $ 120,000 which they had originally intended to donate. When Father John informed the congregation of the above plan, they were suspicious that petitioners would renege on their promise. They hesitated, therefore, to move into the building and begin renovations since they had been disappointed by a previous "donor" who had offered them property, but refused to give them the deed to it. To alleviate any unsettledness, *600 and to show their good faith to the community, petitioners agreed to quitclaim an undivided 20 percent interest in the property to the Church, free and clear of all liabilities attached to such interest. On or about December 1, 1981, petitioners purchased the Santa Cruz property (land and building) for $ 545,000 plus costs for a total of $ 548,258.47. [2] Petitioners made a cash down payment of $ 141,258.46 and assumed a first mortgage, held by County Bank of Santa Cruz, in the amount of $ 109,190.23 with the outstanding balance payable in June 1982. Petitioners financed the balance of the purchase price by executing three notes (Hogg Notes) to the Hoggs, secured by second, third, and fourth deeds of trust, in the respective amounts of $ 82,000, $ 135,809.77, and $ 80,000. On December 20, 1981, petitioner paid a $ 3,000 finder's fee to Jim Peterson, a member of the Church, for his help in finding the Santa Cruz property for the Church. Petitioners promised the Church that they would pay 100-percent of the loan payments as they came due up until such time as the Church could purchase *601 their 80-percent interest. On December 26, 1981, petitioners transferred to the Church, by way of quitclaim deed, an undivided 20-percent interest in the Santa Cruz property. On December 26, 1981, Father John received possession of the deed. The deed was not notarized due to simple oversight, but it was duly executed by petitioners and accepted by Father John as a gift from petitioners to the Church. The deed was not recorded at this time either, since Mr. Douglas and Father John feared that recording the deed would trigger immediate payment of the first mortgage originally due in June 1982. Therefore, Father John and Mr. Douglas agreed that the deed would not be recorded until the Church had raised enough money to pay off the first mortgage. With that understanding Father John took possession of the deed. On December 26, 1981, Father John wrote a letter to petitioners thanking them for their gift of the property. Also in 1981, Mrs. Douglas donated an antique chair and an organ to the Church valued at $ 5,000. By early 1982, it was clear to all interested parties that the Church would not be able to make the balloon payment on the County Bank mortgage due in June 1982. Therefore, *602 petitioners personally borrowed the money from another bank and made the $ 108,626.64 payment themselves. From January 1982 until May 1983, petitioners made all payments that came due (including the Church's 20-percent interest) on all four mortgages as follows: COUNTY BANK
HOGG NOTES
Name
OF S.C.
Rate of Int.
9.75%
12%
13%
12%
Amt. of Mtg.
$ 109,190.23
$ 80,000
$ 82,000   $ 135,809.77   Payments
Interest Only
Interest Only
Interest Only
1/82
$  1,138.23 $ 883.33    2/82
1,138.23 883.33    3/82
1,138.23 883.33    4/82
1,138.23 883.33    5/82
1,138.23 883.33    6/82
108,626.64 $ 4,800
883.33    $ 8,148.59   7/82
-     883.33    8/82
-     883.33    9/82
-     883.33    10/82
-     883.33    11/82
-     883.33    12/82
-     4,800
883.33    8,148.59   TOTALS
$ 114,317.79 $ 9,600
$ 10,599.96    $ 16,297.18   1/83
-     883.33    2/83
-     883.33    3/83
-     883.33    4/83
-     883.33    5/83
-     883.33    $ 4,416.65    *603 At all times the Church had 100-percent use, possession, and control over the Santa Cruz property. Petitioners never had a key to the property; nor did they exercise any control over the property in any other respect, including renovating the property. They did, however, receive ten $ 2,000 payments ($ 20,000) of rent on the property in 1982 and five $ 2,000 payments ($ 10,000) in 1983, which they properly included in their gross income for the respective years. Around late May 1983, petitioners were anxious to get out from under their obligations on the Santa Cruz property because it was costing them well over what they had intended to expend. In July 1983, petitioners and the Church entered into their final agreement whereby the Church would purchase the remaining 80-percent interest in the property at a price equal to 80-percent of the Hoggs' original asking price, i.e., approximately $ 750,000. By this time the property had appreciated in value and was probably worth in excess of $ 900,000, since it was located in a prime area of downtown Santa Cruz. Since the Church still had little or no money, petitioners agreed to take a note for $ 307,217.04 plus interest at 9-percent, *604 payable in installments of $ 30,000 principal only per annum beginning November 1, 1983, and continuing until November 1, 1985, and principal payments of $ 20,000 beginning November 1, 1986 and continuing until November 1, 1989, with the balloon payment of $ 137,217.04 due and payable on November 1, 1990. Accrued interest was due and payable annually on or before the end of each calendar year with the entire unpaid accrued interest payable on November 1, 1990. However, because the Church was still not in a financial position to legally assume the Hoggs' notes, it entered into an agreement with petitioners that, although petitioners would remain primarily liable on the notes, it would make all payments attributable thereto. In a written agreement entered into by petitioners and the Church, prior to the final sale of the property, petitioners promised to waive, by way of gift, the amount of interest accrued and becoming due under their note at the end of each calendar year. Petitioners further agreed that the annual installments of principal due for 1983, 1984, and 1985 ($ 30,000 for each year) would be recontributed by them to the Church as charitable gifts. On June 14, 1983, petitioners *605 transferred, by way of grant deed, their 80-percent interest in the property to the Church. The deed was to be recorded at closing. On July 20, 1983, petitioners sold their 80-percent interest utilizing the installment method of reporting gain. On December 14, 1983, the Church made a $ 30,000 payment to petitioners. The Church never paid petitioners any interest on their note. On December 28, 1983, petitioners issued and mailed a check for $ 30,000 to the Church. The check was processed January 4, 1984. During the years in issue and up to the present, Mrs. Douglas maintains all petitioners' receipts, Forms 1099, cancelled checks, and other supporting documents. At the end of their taxable year she takes all their records to their CPA, Mr. Lombardi, who prepares their tax returns. Upon receipt of this information, Mr. Lombardi goes through the records and determines what he needs to prepare the return. For the years in issue petitioners relied upon Mr. Lombardi to correctly prepare and timely file all their tax returns. 1981 Tax Return
On April 13, 1982, Mr. Lombardi filed Form 4868 for an automatic two-month extension to file petitioners' 1981 tax return. On June 10, 1982, Mr. *606 Lombardi filed Form 2688 requesting a further extension to file until September 15, 1982. This extension was approved on June 25, 1982. Unknown to petitioners, Mr. Lombardi failed to file another Form 2688 requesting an additional two-month extension. Petitioners' 1981 tax return was received in the San Francisco office on November 1, 1982, one and one-half months late. Mrs. Douglas believed all information necessary to prepare their 1981 tax return was turned over to Mr. Lombardi. Mr. Lombardi reported all of their income and interest from Forms 1099, and all other information he received from petitioners. Mr. Lombardi was aware of petitioners' purchase of the Santa Cruz property. However, neither the $ 92,000 interest income nor the charitable deduction of 20-percent of the value of the Santa Cruz property was reported on petitioners' 1981 return. However, they did claim the $ 5,000 charitable contribution to the Santa Cruz Church. 1982 Tax Return
Petitioners filed their Federal income tax returns for taxable year 1982 with the Internal Revenue Service Center, Fresno, Calif. On their return petitioners claimed a net loss of $ 52,285, attributable to leasing their *607 80-percent interest in the Santa Cruz property to the Church, computed as follows: Total Rental Income
$ 20,000 Less fully deductible
expenses
Depreciation
$ 23,279  Commissions
3,000  Insurance
750  Interest
44,806  Pest Control
450  ($ 72,285)
(72,285)
Net loss from rental activity
(52,285)
The depreciation claimed was based upon 100-percent of the property's total basis. Petitioners concede that the depreciation was overstated by $ 4,720. 1983 Tax Return
On their 1983 return petitioners claimed a net loss of $ 26,322 computed as follows: Total Rental Income
$ 10,000 Less deductible expenses:
Depreciation
$ 10,906 Interest
17,390 Taxes-Property
8,026 Total Expenses
($ 36,322)
(36,322)
Net Loss
from rental activity
$ 26,322
Mr. Lombardi also handled the way the leasing transaction and expenses were reported. Petitioners do not understand what depreciation is or how it is calculated, and they left it up to Mr. *608 Lombardi to properly prepare their tax returns. For purposes of computing petitioners' gain on the sale of their 80-percent interest a basis of $ 408,075 ($ 437,460 - $ 29,385 accumulated depreciation) was used to compute the gross profit ratio. However, in computing installment sale income received during the year, petitioners failed to report the $ 30,000 principal installment payment dated December 14, 1983, received from the Church. Respondent disallowed all deductions claimed in 1982 and 1983 attributable to the Santa Cruz property, except those for interest and taxes, thereby resulting in disallowed losses of $ 27,749 and $ 10,906 for 1982 and 1983, respectively. On October 9, 1986, respondent timely issued a statutory notice of deficiency to petitioners for the above stated years. OPINION Validity of the Gift
The first issue for decision is whether petitioners made a completed gift of a 20-percent interest in the Santa Cruz property in 1981 and, if so, the value of the gift and the amount of their charitable deduction. Petitioners allege that they made a completed gift of a 20-percent interest in the property to the Prophet Elias Greek Orthodox Church of Santa *609 Cruz in December of 1981, and are, therefore, entitled to a charitable deduction in 1981. Respondent contends that no gift was made in 1981, but rather, petitioners merely leased 100-percent of the Santa Cruz property to the Church until 1983 when petitioners sold their 100-percent interest in the property to the Church. Section 170(a) allows as a deduction any charitable contributions (as defined in subsection (c)) payment of which is made within the taxable year. Sec. 170(a)(1). Charitable contribution is defined as a "contribution or gift." Sec. 170(c). See DeJong v. Commissioner, 36 T.C. 896, 899 (1961), affd. 309 F.2d 373 (9th Cir. 1962). "A gift is generally defined as a voluntary transfer of property by the owner to another without consideration therefor." DeJong v. Commissioner, 36 T.C. at 899. A gift, in the statutory sense, proceeds from a "detached and disinterested generosity out of affection, respect, admiration, charity or like impulses." (Citations omitted.) Commissioner v. Duberstein, 363 U.S. 278, 285 (1960). In determining whether a gift was made, the most critical consideration, is the transferor's *610 intent or dominant motive in making the transfer. Commissioner v. Duberstein, 363 U.S. at 286. In identifying the dominant motive, "our examination is not limited to the narrow probing of the subjective attitude of the donor and the degree of charitable benevolence which may have prompted the transfer. We must look at the true nature of the transaction, and make an objective inquiry as to whether what is called a gift actually amounts to that in reality." Considine v. Commissioner, 74 T.C. 955, 967 (1980); see Commissioner v. Duberstein, supra, and Pettit v. Commissioner, 61 T.C. 634, 638-639 (1974). The essential elements of a gift are (1) a donor competent to make a gift; (2) a donee capable of taking the gift; (3) a clear and unmistakable intention on the part of the donor to absolutely and irrevocably divest himself of the title, dominion, and control of the subject matter of the gift in praesenti; (4) the irrevocable transfer of the present legal title and of the dominion and control of the entire gift to the donee, so that the donor can exercise no further act of dominion or control over it; (5) a *611 delivery by the donor to the donee of the subject of the gift or of the most effectual means of commanding the dominion of it; (6) acceptance of the gift by the donee * * * [Guest v. Commissioner, 77 T.C. 9, 16 (1981).] Petitioners bear the burden of proof on this issue. Rule 142(a); Guest v. Commissioner, supra.
Petitioners allege that the evidence clearly establishes the existence of all the above elements. Respondent concedes that the first two elements are sufficiently established, but contends that the remaining elements are not present. We agree with petitioners. Respondent first contends that the subject matter of the gift was not sufficiently established by petitioners since petitioners asserted at least five different amounts which they intended to give to the Church. Respondent further contends that because the subject matter of the gift was not established, the donee could not possibly have accepted anything. We do not agree. The five amounts respondent makes reference to as representing inconsistencies with regard to the subject matter of the gift are (1) $ 120,000: the amount petitioner had originally wanted to give *612 the Greek Church in Marin, Calif.; (2) $ 109,959: the amount petitioners first alleged to be the value of the 20-percent interest in the Santa Cruz property; (3) $ 84,256: the amount petitioners' expert, Mr. Hayes, appraised the value of the 20-percent interest to be in 1981; (4) $ 141,224: the amount petitioners alleged, in their amended petition, as the amount of charitable deduction in 1983 as a result of a bargain sale in that year, if we were to find that no gift was made in 1981; and (5) $ 299,776: [3] the total amount petitioners allege, under an additional alternative theory, they made as charitable contributions to the Church from 1981 through 1983. It is clear from the facts before us that petitioners intended to make a gift of a 20-percent interest in the Santa Cruz property in 1981 to the Church and that the Church knew this and accepted it. The subject matter was 20-percent of the Santa Cruz property regardless *613 of whether it had a value of $ 100 or $ 100,000. Here, the value of the property is important for purposes of establishing the amount of the charitable contribution and the charitable deduction, not the "subject matter" of the gift. Respondent argues that petitioners asserted at trial that their gift was contingent upon the church's paying off the $ 109,190.23 first mortgage due in June 1982. We do not agree. Petitioners never made such an assertion and we find that the gift was never contingent upon anything. The fact that Father John and petitioners wanted the Church to pay off the first mortgage before the deed was recorded does not negate the fact that petitioners intended to make a gift. Respondent next contends that since there was no intent to record the quitclaim deed until after the first mortgage was paid off, and since the deed was never in fact recorded, petitioners did not sufficiently divest themselves of control over the property. Respondent further contends that petitioners failed to prove either actual or constructive delivery of the deed. Respondent relies upon our decision in Alioto v. Commissioner, T.C. Memo. 1980-360, affd. in an *614 unpublished opinion 692 F.2d 762 (9th Cir. 1982), for support of this latter contention. Petitioners argue that they never had possession of the property and, further, that the deed was actually delivered to the Church even though it was not recorded at that time. We agree. Section 1.170-1(b), Income Tax Regs., states in part: "ordinarily a contribution is made at the time delivery is effected." Among the elements a taxpayer must prove is a clear intention to absolutely and irrevocably divest himself of title, dominion, and control over the entire gift, in praesenti. Brotzler v. Commissioner, T.C. Memo. 1982-615. The undisputed evidence shows that petitioners never had physical possession of any portion of the property. They did not even have a key to the premises. Father John had possession of the key from the outset. Furthermore, there is sufficient evidence indicating that petitioners never intended to exercise any control over the property. As far as petitioners were concerned the property "belonged" to the Church. Where a gift of real property is made, by way of a deed, state law controls when the deed is effectively delivered. *615 Guest v. Commissioner, 77 T.C. 9, 18 (1981); Greer v. Commissioner, 70 T.C. 294, 304 (1978), affd. 634 F.2d 1044 (6th Cir. 1980); Alioto v. Commissioner, supra. Under California law, a grant takes effect, so as to vest the interest intended to be transferred, only upon its delivery, either actual or constructive, by the grantor. See Cal. Civ. Code secs. 1054 and 1059 (West 1982). In Alioto v. Commissioner, supra, we found that the taxpayer had failed to make actual delivery of the deed. We further found that the taxpayer had merely made promises to various charitable institutions to give them various property interests, and made no specific commitment as to the time the gift would be made, or the specific property interests to be given. As a result thereof, we concluded that there was no constructive delivery. Here, however, there is sufficient evidence indicating that the deed was actually delivered. Petitioners, as well as their witnesses, testified to this fact. We find their testimony credible and accept it as true. However, even if there was no actual delivery, *616 there is sufficient evidence of the deed's constructive delivery to the Church. Section 1059 of the California Civil Code provides: Though a grant be not actually delivered into the possession of the grantee, it is yet to be deemed constructively delivered in the following cases: 1. Where the instrument is, by the agreement of the parties at the time of execution, understood to be delivered, and under such circumstances that the grantee is entitled to immediate delivery * * *. Furthermore, the evidence shows that all parties to the transaction knew that petitioners intended to give, and the Church intended to receive, a 20-percent interest in the property. It also shows that the transfer of the deed, and the 20-percent interest, was to be made in December 1981. Petitioners completely and effectively divested themselves of total possession and control over a 20-percent interest in the property, and the deed was in fact delivered. Based upon the foregoing, we find that a completed gift of a 20-percent interest in the Santa Cruz property was effected on December 26, 1981, and we hold accordingly.
(a) Value of Gift
Petitioners contend that the fair market value of *617 the gift and the value of their charitable contribution ranges between $ 84,256 and $ 109,965. Respondent never contested that the fair market value of the 20-percent interest was 20-percent of petitioners' cost. Since respondent never contested that the value of the 20-percent interest was 20-percent of the property's cost, we find the value of the gift to be $ 109,652, i.e., $ 548,258 X 20-percent. There was also evidence that petitioners paid an additional $ 3,000 to Jim Peterson as a finder's fee and, because Mr. Peterson found the property on behalf of the Church long before petitioners were involved in the purchase arrangement, we believe that the ultimate liability for payment lies with the Church. Therefore, we find that the $ 3,000 payment was made by petitioners on behalf of the Church and should properly be characterized as an additional charitable contribution to the Church in 1981. (b) Amount of Charitable Contribution
We must now determine the amount of petitioner's charitable contribution with respect to the gift. Petitioners allege that the amount of their charitable contribution is the full value of the 20-percent interest, i.e., $ 109,652, without *618 any reduction for liabilities. Petitioners further allege that their oral promise to retain the liabilities otherwise allocable to the 20-percent interest is enforceable under California law and as such should be respected here for Federal tax treatment under section 170. Respondent contends that the value of the charitable contribution is limited to 20-percent of petitioners' equity interest at the time of the contribution, i.e., $ 28,252. Respondent further contends that petitioners' oral promise "to retain all liabilities and give the 20-percent interest free and clear of all encumbrances" may be enforceable under state law as between themselves, but for Federal tax purposes it is inconsequential. Petitioners have the burden of proving the amount of the charitable contribution they may deduct. Guest v. Commissioner, 77 T.C. at 26; Rule 142(a). Section 1.170A-1(c), Income Tax Regs., provides that if a charitable contribution is made in property, other than money, the amount of the contribution is the fair market value of the property at the time of the contribution reduced as provided for in section 170(e)(1) or section 170(e)(3). It is well settled that *619 "When a gift to a charity of property subject to an encumbrance is made, the amount of the deduction is the donor's equity in the fair market value of the property, and the difference between the fair market value of the property and the amount of the encumbrance therein." Scott v. Commissioner, 61 T.C. 654, 662 (1974). See Guest v. Commissioner, 77 T.C. at 25. This is true because, normally, when a donor donates property subject to a mortgage not only does he dispose of the property but he also rids himself of the mortgage obligations which attach to the land. Accordingly, this relief from such indebtedness is treated as an amount realized which must offset the amount of the charitable deduction. Ebben v. Commissioner, 783 F.2d 906 (9th Cir. 1986), affg. in part and revg. in part a Memorandum Opinion of this Court. See Tidler v. Commissioner, T.C. Memo. 1987-268. This is true even if the grantee does not assume personal liability and merely takes the property subject to the mortgage. Tidler v. Commissioner, supra; see Crane v. Commissioner, 331 U.S. 1 (1947); Johnson v. Commissioner, 59 T.C. 791, 808-812 (1973), *620 affd. 495 F.2d 1079 (6th Cir. 1974), cert. denied 419 U.S. 1040 (1974); and section 1.1011-2(a)(3), Income Tax Regs.
Section 1.1011-2(a)(3), Income Tax Regs., provides that, in the case of a "bargain sale," "if property is transferred subject to an indebtedness, the amount of the indebtedness must be treated as an amount realized for purposes of determining whether there is a sale or exchange to which section 1011(b) and this section apply, even though the transferee does not agree to assume or pay the indebtedness." Here, although petitioners' gift to the Church did not constitute a bargain sale, since the amount of the mortgage indebtedness did not exceed petitioners' basis in the property, the above rationale is still applicable to the situation found in this case. It is a fact that the donated property remained subject to the mortgage and to foreclosure by the mortgagee in the event petitioners failed to pay the amounts due. See Tidler v. Commissioner, supra, 53 T.C.M. 934, 945, 56 P-H Memo T.C. par. 87,268 at 87-1304. Petitioners further allege that "this Court has accepted the principle that title can pass without the *621 purchaser assuming the mortgage or taking subject to a mortgage." Petitioners rely on Professional Equities, Inc. v. Commissioner, 89 T.C. 165 (1987), and the cases cited therein for this proposition. Petitioners' reliance on those cases for that proposition is misplaced. Those cases dealt with a sale of mortgaged property under section 453, and the determination of the total contract price where the seller was using a wraparound mortgage rather than allowing the buyer to assume or take subject to the liability. They did not involve a gift of mortgaged property to a section 501(c)(3) charity. Furthermore, nowhere in those cases did this Court state that "title can pass without the purchaser assuming the mortgage or taking subject to a mortgage." The fact is that, in those cases, the seller of the property, pursuant to the contract of sale agreement, did not transfer title to the property until the buyer had fully performed the terms of the contract. Generally, "every sale of mortgaged property is subject to a mortgage since the property remains liable to have the mortgage debt satisfied from it * * *." Stonecrest Corp. v. Commissioner, 24 T.C. 659, 668 (1955). *622 The evidence clearly shows that (1) petitioners intended to and, in fact, did make all payments on the liabilities attributable to the 20-percent interest up to the time they entered into sale/purchase negotiations with the Church in May or June of 1983, and (2) that the Church did not agree to pay the outstanding liabilities until the 80-percent interest was purchased in 1983. Although petitioners remained liable on the outstanding indebtedness and, therefore, received no relief from indebtedness, based upon the foregoing, we find that the value of the charitable contribution must be reduced by 20-percent of the value of the outstanding liabilities in accordance with section 1.170A-3(d), Income Tax Regs. Here, 20-percent of the outstanding liabilities, as of the date of the contribution, is $ 81,400 (20 percent X $ 407,000) resulting in a charitable contribution of $ 28,252 ($ 109,652 - $ 81,400). Moreover, we find that petitioners' 1981 promise was a promise to make payments at points of time in the future and that such promise does not give rise to a charitable contribution until payment is actually made. See Tidler v. Commissioner, supra.
Here petitioners gave *623 $ 109,652 worth of property to the Church and for approximately 1-1/2 years made all payments attributable to their 80-percent interest and the gifted 20-percent interest. Total payments of $ 153,996 and $ 17,390 [4] were made by petitioners in 1982 and 1983, respectively, 20-percent of which represents additional charitable contributions to the Church for those years. Based upon the foregoing we find that petitioners made additional charitable contributions of $ 30,799 and $ 3,478 in 1982 and 1983, respectively. In respondent's explanation of adjustments, he determined, as a protective measure only, that if we found petitioners in fact made a gift of a 20-percent interest in the Santa Cruz property to the Church in 1981 for which a section 170(c) charitable deduction was allowed, then petitioners are required to recapture, as a recovery of a tax benefit item, pursuant to section 111, the value of their prior deduction in 1981, *624 since they allegedly sold 100-percent of the Santa Cruz property in 1983. We find respondent's position to be without merit. Since we find that petitioners made a completed gift of a 20-percent interest in the property in 1981, a fortiori, we also find that petitioners owned only 80-percent of the property in 1983 when the sale occurred. Therefore, they could have sold only the remaining 80-percent interest. Petitioners alternatively argued that they are entitled to a charitable deduction in 1983 resulting from a bargain sale of 100 percent of the property, if we find that no gift was made in 1981. However, since we find that petitioners made a gift in 1981, we need not address this alternative argument. Section 183
The next issue for our decision is whether petitioners' activity of leasing their 80-percent interest in the Santa Cruz property to the Church was engaged in for profit. Petitioners allege that they entered into the activity for profit and, therefore, the expenses associated with such activity are fully deductible, resulting in a net loss deduction of $ 52,282 and $ 26,322 for 1982 and 1983, respectively. Respondent contends that the activity was not *625 engaged in for profit and thus section 183(b) limits the amount of allowed deductions to $ 44,806 and $ 25,416 for 1982 and 1983, respectively, resulting in net losses from such activity in the respective amounts of $ 24,806 and $ 15,416. Petitioners bear the burden of proving their entitlement to their claimed deductions. Rule 142(a). Throughout this proceeding petitioners have demonstrated and proved to us that their sole purpose in entering into this leasing arrangement with the Church was to enable the Church to have 100-percent use of the property and later purchase petitioners' 80-percent interest in the property. There is no evidence before us indicating that petitioners had any intent other than to help the Church. The mere fact that petitioners sold their 80-percent interest at a profit does not negate the fact that their intent in purchasing and renting the property was to help the Church. Having considered the factors contained in section 1.183-2(b), Income Tax Regs., within the context of the facts presented here, we find that petitioners have failed to prove that they possessed the requisite profit objective in connection with their leasing activity in 1982 and *626 1983. Accordingly, section 183(b) applies to limit the deductions claimed by petitioners. Petitioners claimed deductions, on their 1982 and 1983 tax returns, for all interest they paid during such time. In 1982 petitioners claimed, and were allowed, a $ 44,806 interest deduction representing interest paid during 1982 attributable to the Santa Cruz property. In 1983 petitioners claimed, and were allowed, a $ 17,390 interest deduction. For those years, petitioners should have treated 20-percent of the interest paid on the outstanding liabilities as additional charitable contributions for such year. They are not permitted to deduct the interest attributable to the Church's property under section 163 via section 183. Since we found, as indicated above, that 20-percent of the payments were made on behalf of the Church and constituted additional charitable contributions, we find that the interest deductions allowed pursuant to section 183(b)(1) must be reduced by $ 8,961 and $ 3,478 for 1982 and 1983, respectively. We further find that since no depreciation deductions were allowed to be taken because of section 183(b)(2) limitations, section 1016 does not operate to reduce petitioners' *627 basis in their 80-percent interest of the Santa Cruz property in either 1982 or 1983. Alternatively, petitioners allege that if we find that the activity was not entered into for profit, then the expenses attributable to insurance, pest control, and commissions, should be allowed as a deduction under section 170(c) since they were paid on behalf of the Church. In support of their contention, petitioners refer us to Estate of Carroll v. Commissioner, 38 T.C. 868 (1962). Respondent contends that the disallowed rental expenses are not allowed as a charitable deduction since petitioners have failed to show that such expenses were occasioned strictly by the needs of the Church in their use of the property. Respondent also relies upon our decision in Estate of Carroll v. Commissioner, supra, in support of his contention. In Estate of Carroll v. Commissioner, supra, we concluded that the determinative question as to whether the taxpayer was entitled to a charitable deduction for expenditures made for rehabilitation work on a Church he had title to, was whether the particular expenses were actually intended by the taxpayer to *628 be, and were, incurred exclusively "for the use of" the Church, enabling it to function as a parish church for the benefit of the community. We concluded that under the facts of that case the expenses were deductible under section 170(a). We based our decision on the fact that for over 240 years the property had been operated exclusively as a Church and by the Church, and the fact that the expenditures were necessary and essential if the Church was to continue its worship on that property. Here, however, we find the insurance expense a nonessential expense for the Church to carry out its main purpose. With respect to the $ 3,000 commission, we have already discussed its tax treatment above and concluded that it was a charitable contribution for taxable year 1981, not 1982. With respect to the pest control expense, since we believe that the use of the building by the Church for its intended purposes would be frustrated if pest control was not used, we find petitioners' payment of $ 450 to be a charitable contribution. Furthermore, we find that this expense was not intended to be, and was not, for petitioners' own benefit. Petitioners were planning to sell the property to the *629 Church as soon as it could afford to purchase the remaining 80-percent interest. Based upon the foregoing we find $ 450 of the $ 4,200 to be a charitable contribution for taxable year 1982. Charitable Contribution of $ 30,000 in 1983
The next issue for our decision is whether petitioners are entitled to deduct $ 30,000 as a charitable contribution on their 1983 return. Petitioners allege that they reported the gain on the sale of their 80-percent interest to the Church; received a $ 30,000 payment; and in turn, made a $ 30,000 charitable contribution in 1983. Respondent contends that petitioners failed to present any competent evidence or explanation supporting their claim. The evidence shows that petitioners failed to include in 1983 the $ 30,000 payment from the Church on their Form 6252, Computation of Installment Sale Income, and, therefore, did not report a gain in 1983 on such sale. The evidence also shows that in 1983, prior to the final sale of their 80-percent interest, petitioners and Father John entered into a written agreement. The agreement as signed by all interested parties, states, in pertinent part: 2. Douglas agrees that during the term of that *630 Note secured by Trust Deed to be given by the Church to Douglas, Douglas shall make annual pledges to the Church equal to the amount of annual interest due from the Church to Douglas under the terms of said Note. Douglas agrees to waive by way of gift the amount of interest accrued and becoming due under said note at the end of each calendar year. 3. In addition, Douglas further agrees that the annual installments of principal due from the Church to Douglas under the terms of said Note for the years 1983, 1984, and 1985 (installment payments of $ 30,000 due November 1, 1983, -84, and -85) shall be forgiven in the form of charitable gifts from Douglas to the Church. It is clear that petitioners intended, by entering into the above agreement, to further help the Church in later years. Furthermore, Mr. Douglas' testimony at trial and the introduction of their cancelled check further substantiates petitioners' claim that they made a $ 30,000 charitable contribution in 1983. We find that petitioners made a charitable contribution of $ 30,000 in 1983. Additions to Tax under Section 6651(a)(1)
The next issue for our decision is whether petitioners are liable for the addition *631 to tax under section 6651(a)(1) for failure to timely file their Federal income tax return for 1981. Section 6651(a)(1) imposes an addition to tax for the failure to file a required return "unless it can be shown that the failure is due to reasonable cause and not due to willful neglect." Sec. 6651(a)(1). To avoid the addition to tax the taxpayer must prove (1) that the failure to file was due to reasonable cause, and (2) that the failure was not the result of "willful neglect." Sec. 6651(a)(1); United States v. Boyle, 469 U.S. 241, 243 (1985). The burden of proof is upon petitioner. Rule 142(a). Petitioners allege that they are not liable for the addition to tax because their failure was due to reasonable cause and not willful neglect since they relied upon Mr. Lombardi to properly prepare their return. Respondent contends that petitioners have failed to establish that their failure was due to reasonable cause. We agree. For purposes of section 6651(a)(1) "reasonable cause" has been defined as the exercise of "ordinary business care and prudence." Sec. 301.6651-1(c)(1), Proced. & Admin. Regs. In United States v. Boyle, supra, the *632 Supreme Court sought to clarify the meaning of "reasonable cause" in the situation where an executor relied upon his attorney to timely file the decedent's Federal estate tax return. In Boyle, the executor of an estate argued that because he relied upon counsel to timely file a return for the estate, his failure to file was due to reasonable cause. The Court held that reliance on an agent does not excuse the failure to make a timely filing of a tax return and stated: Congress has placed the burden of prompt filing on the executor, not on some agent or employee of the executor. That the attorney, as the executor's agent, was expected to attend to the matter does not relieve the principal of his duty to comply with the statute. [United States v. Boyle, 469 U.S. at 249-250.] See Estate of Paxton v. Commissioner, 86 T.C. 785, 819 (1986); Jackson v. Commissioner, 86 T.C. 492, 538 (1986), affd. 864 F.2d 1521 (10th Cir. 1989). Here the evidence clearly shows that petitioners relied upon their agent, Mr. Lombardi, to properly prepare and timely file their 1981 tax return. However, in light of Boyle, reliance *633 upon an agent to timely file a tax return does not constitute "reasonable cause." Therefore, petitioners are liable for the addition to tax under section 6651(a)(1) as determined by respondent. Additions to Tax for Negligence
Finally, we must decide whether respondent properly determined petitioners' liability for additions to tax under section 6653(a) for negligence. Petitioners argue that the omission of interest income on their 1981 tax return was not due to their negligence or intentional disregard of rules and regulations, but to inadvertence. They say the disallowed rental expense deductions taken in 1982 and 1983 were claimed in reliance on Mr. Lombardi's advice and expertise, and that such reliance was reasonable under the circumstances. Respondent contends petitioners' failure to provide Mr. Lombardi with complete records was negligent and that petitioners should not be permitted to transfer responsibility for their negligence to their agent. We agree with respondent as to 1981, but find for petitioners for 1982 and 1983. Section 6653(a) imposes an addition to tax equal to 5 percent of the underpayment whenever any part of underpayment of tax is due to negligence *634 or intentional disregard of rules or regulations. Under section 6653(a) "negligence is lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances." Neely v. Commissioner, 85 T.C. 934, 947 (1985), quoting Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), cert. denied 389 U.S. 1044 (1968). The Commissioner's determination of negligence is presumed to be correct and the taxpayer has the burden of proving the determination erroneous. Luman v. Commissioner, 79 T.C. 846, 860-861 (1982); Rule 142(a). A taxpayer has a duty to file complete and accurate tax returns and generally cannot avoid this duty by placing responsibility with an agent. United States v. Boyle, 469 U.S. at 250-251; Ma-Tran Corp. v. Commissioner, 70 T.C. 158, 173 (1978). However, a taxpayer may be insulated from liability for the negligence addition by a good faith reliance on professional advice. Jackson v. Commissioner, 86 T.C. at 539-540; Woodbury v. Commissioner, 49 T.C. 180, 200 (1967). To be insulated, however, *635 a taxpayer must have provided the agent with correct information and the error must be due to the agent's mistakes. Pessin v. Commissioner, 59 T.C. 473, 489 (1972); Enoch v. Commissioner, 57 T.C. 781, 803 (1972). With respect to the underpayment of tax for 1981 petitioners argue that they received the interest payment on or around January 2, 1981, and that instead of depositing the payment in their checking account they purchased a certificate of deposit with it. Thus, Mr. Lombardi was not able to detect the payment when he examined their checking account. They further contend that when all their receipts for 1981 were given to Mr. Lombardi, they did not know that they had not received a Form 1099 with respect to the interest and, therefore, the omission was inadvertent. The evidence indicates that petitioners had no intent to hide the amount and, when it was called to their attention that the $ 92,000 of interest had not been included in their 1981 return, they readily acknowledged their mistake. However, based upon the facts before us, we are unable to conclude petitioners' mistake was not negligent. The mere fact that they failed to receive *636 a Form 1099 does not negate their negligence. Based upon the foregoing, we find petitioners liable for the addition to tax under sections 6653(a)(1) and (a)(2) for 1981, taking into consideration adjustments made herein to such taxable year. With respect to taxable years 1982 and 1983, the evidence is abundantly clear that petitioners completely and reasonably relied upon their CPA's advice with respect to those deductions. It is also clear that petitioners had no reasonable way of knowing that Mr. Lombardi's advice was incorrect. This is true especially in light of petitioners' level of education. See Kennedy v. Commissioner, T.C. Memo. 1987-430; Horstmier v. Commissioner, T.C. Memo. 1983-409, affd. in an unpublished opinion 776 F.2d 1052 (9th Cir. 1985). Therefore, with respect to taxable years 1982 and 1983, we find that petitioners were not negligent and hold that the addition to tax under sections 6653(a)(1) and (2) for such years do not apply. Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the calendar years 1981, 1982, and 1983. All Rule references are to the Tax Court Rules of Practice and Procedure. * 50-percent of the interest due on the portion of the underpayment attributable to negligence.↩
2. $ 545,000 + $ 3,938.57 = $ 548,938.57 - $ 680.11 prepurchase interest = $ 548,258.46.↩
3. Respondent, on brief, actually made reference to $ 294,427 when the correct amount was $ 299,776. The $ 299,776 represents payments of $ 144,238.46, $ 151,096.59, and $ 4,441 petitioners allege they made in 1981, 1982, and 1983, respectively.↩
4. These figures represent the payments made on the four outstanding liabilities at the Santa Cruz property, plus additional interest paid on account of such property which respondent allowed as a deduction on petitioners' 1982 and 1983 tax returns.↩